# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

*In re Marriage of O'Brien*, 2011 IL 109039

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* MARRIAGE OF JOHN O'BRIEN, Appellant, and LISA O'BRIEN, Appellee. |
| | |
| Docket No. | 109039 |
| Filed | August 4, 2011 |
| Rehearing denied | November 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A petition to substitute a judge for cause after a substantive ruling is properly evaluated by the statutory standard of actual prejudice, rather than by the standard of appearance of impropriety utilized in the Judicial Code in connection with judicial recusal. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lake County, the Hon. Joseph R. Waldeck, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Ariano, Hardy, Nyuli, Johnson, Richmond & Goettel, P.C., of South Elgin (Randy K. Johnson, of counsel), for appellant.

David R. Del Re, of Waukegan, and Mark J. Vogg, of McHenry, for appellee.

Scott Colky, of Colky & Kirsh, Ltd., of Chicago (Paul L. Feinstein, of counsel), for *amicus curiae* Illinois Chapter, American Academy of Matrimonial Lawyers.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices Thomas, Burke, and Theis concurred in the judgment and opinion.

Justice Garman specially concurred, with opinion.

Justice Karmeier specially concurred, with opinion, joined by Chief Justice Kilbride.

## OPINION

¶ 1     The circuit court of Lake County entered a judgment dissolving the marriage of John and Lisa O'Brien. The appellate court affirmed the circuit court's order. 393 Ill. App. 3d 364. John then applied for a certificate of importance (see Ill. Const. 1970, art. VI, § 4(c); Ill. S. Ct. R. 316 (eff. Dec. 6, 2006)), which was granted. We now affirm the judgment of the appellate court.

¶ 2                          Background[1]

¶ 3     In November 2003, Lisa filed domestic battery charges against her estranged husband, John. Judge Joseph Waldeck presided over an evidentiary hearing in the matter, ultimately ruling in favor of admitting certain evidence over John's objection. The case was subsequently tried before a different judge, and John was found not guilty.

¶ 4     On November 12, 2003, John subsequently filed a petition to dissolve his marriage to Lisa. Orders regarding financial matters, custody, and visitation were entered by the court.

---

[1]In his special concurrence, Justice Karmeier states that our opinion's "discussion of the relevant facts is incomplete." *Infra* ¶ 66 (Karmeier, J., specially concurring, joined by Kilbride, C.J.). Justice Karmeier does not identify which relevant facts we have omitted; however, we are confident that we have included all of the facts necessary for a complete and thorough understanding of the case.

Following various developments not relevant to this appeal, the cause was assigned to Judge Waldeck.

¶ 5      At the outset of a March 8, 2005, hearing on a motion by John to modify temporary child support, Judge Waldeck made the observation that the parties had previously been before him in the domestic battery case. John's lawyer stated that neither he nor his client objected to Judge Waldeck continuing to preside over the dissolution action. According to John's lawyer, there was nothing that would require the judge to recuse himself. Lisa's attorney likewise had no objection to Judge Waldeck's continued participation in the case.

¶ 6      Nearly a year later, on January 3, 2006, John sought substitution of judge pursuant to section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)). As grounds for the for-cause substitution, John asserted that Judge Waldeck was "prejudiced and biased" against him as a result of (1) the judge's involvement in the earlier domestic battery case, (2) the judge's membership in a health club where Lisa worked part-time and his exchange of greetings with her at the club "on more than one *** occasion," and (3) the fact that John had observed Lisa "waving to [the judge] in an inappropriate manner, indicating her familiarity with and friendliness toward [him]." John further argued that Judge Waldeck was biased against his attorney.

¶ 7      The substitution request was heard by Judge Christopher Starck. Relevant to the basis for substitution, Lisa testified that, for over 12 years, she did part-time accounting work for a fitness club, where Judge Waldeck was a member. Lisa said that, on one occasion, in the summer of 2005, she saw the judge as she was walking to her car in the club's parking lot. They exchanged hellos without further conversation. Lisa testified that she did not approach the judge and did not believe the judge knew who she was. According to Lisa, a similar encounter took place several weeks later. As she was leaving, she saw the judge in the parking lot as he was entering and they exchanged hellos, again without any further conversation.

¶ 8      Lisa further stated that the amount of time she spent at the fitness club was limited. She devoted approximately two hours per week to club business and most of that was done in her home. She did not exercise at the club, did not recall encountering Judge Waldeck there again after the two incidents, and denied the suggestion that she had told John that she had had contact with the judge outside the courtroom.

¶ 9      John's testimony first focused on the proceedings before Judge Waldeck in the domestic battery hearing and the subsequent dissolution action. With respect to the domestic battery case, John believed that he had appeared before Judge Waldeck "[p]robably up to ten times" in the course of those proceedings. The evidentiary hearing that Judge Waldeck presided over concerned the admissibility of a tape recording made by Lisa. Judge Waldeck had determined that the tape was admissible.

¶ 10     As for the dissolution action, John testified that after Judge Waldeck had been assigned the case, John and Lisa had a lengthy telephone conversation regarding the details of child visitation. John complained to Lisa that whenever there was "any leeway" in her favor, Judge Waldeck had ruled for her. According to John, Lisa "sort of giggled" in response and told him "yes, that's true" and "[my lawyer] and I are taking care of the judge." John further

testified that his previous lawyer had told him that during a meeting in chambers, Judge Waldeck had disclosed to counsel for both parties that Lisa had approached him on several occasions at the fitness club.

¶ 11    Finally, John recounted an incident that took place in December 2005 while he and Lisa were before Judge Waldeck in the dissolution case. John and Lisa were seated on opposite sides of the public gallery. At one point, Lisa rose to leave the courtroom. John claimed that, as she did so, Lisa looked toward the bench and with her "head tilted" in "a very cutesy way" waved to Judge Waldeck. John said he did not see what, if any, reaction Waldeck may have had. It was John's opinion, based on these incidents, that Lisa and Judge Waldeck shared a "very close relationship."

¶ 12    John admitted on cross-examination that his affidavit supporting his substitution petition made no mention that, in any conversation with Lisa, she claimed that she and her lawyer had "taken care" of Judge Waldeck. John also admitted that he did not seek substitution until the year after he said that the conversation had occurred. John further conceded that Judge Waldeck had, in fact, made numerous rulings in his favor. This included allowing him to have visitation with his son notwithstanding the fact that he was subject to an order of protection and had recently been taken by the police to a mental-health facility, involuntarily, for evaluation.

¶ 13    Judge Starck denied John's petition, granting Lisa's request for a directed finding. Judge Starck found that the only contact between Lisa and Judge Waldeck was the exchange of greetings in the parking lot. As for what, if anything, happened when Lisa allegedly waved at Judge Waldeck in court, Judge Starck noted that whatever the circumstances, they were known by John well before he filed his substitution petition. Judge Starck also found that the evidence did not support John's claim that Judge Waldeck always ruled against him. He found no proof of prejudice on Judge Waldeck's part toward John. Judge Starck agreed with the general notion that a court must look to maintain "a feeling of trust and confidence of all of the community in decisions made by the judge" and concluded that there was no evidence presented that would indicate such a "lack of trust and confidence."

¶ 14    On appeal, the appellate court held that Judge Waldeck's limited contact with Lisa had no effect on his ability to preside over the couple's dissolution action. The court concluded that John failed to demonstrate that Judge Waldeck's knowledge of the domestic battery case affected his judgment. The court voiced some concern regarding whether a litigant seeking substitution of judge for cause must always prove actual prejudice. It reasoned, however, that resolution of that issue was not necessary because John could not show actual prejudice, even if it were required. 393 Ill. App. 3d at 378-81.

¶ 15    In a special concurrence, Justice O'Malley observed what he saw as inconsistent treatment in Illinois law regarding substitution for cause. He noted that some reviewing courts require that litigants demonstrate the judge's subjective bias as well as evidence of prejudicial trial conduct, while others use an objective standard based on the appearance of impropriety.

¶ 16    The case comes before this court on John's application for a certificate of importance pursuant to Supreme Court Rule 316 (Ill. S. Ct. R. 316 (eff. Dec. 6, 2006)).

¶ 17                                   Analysis

¶ 18     John contends that his petition for substitution of judge for cause was erroneously denied. He also argues, in the alternative, that Judge Waldeck erred in awarding Lisa maintenance.

¶ 19                              *Substitution for Cause*

¶ 20     Before we begin our analysis, two procedural points deserve comment. The first concerns whether today's opinion is, in fact, "purely advisory," as suggested by Justice Garman. See *infra* ¶ 61 (Garman, J., specially concurring). An opinion is advisory if "it is impossible for this court to grant effectual relief to either party." *In re Mary Ann P.*, 202 Ill. 2d 393, 401 (2002). In his brief submitted to us, John contends that his petition for substitution for cause should have been granted in light of *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009), a case he maintains calls into question the constitutionality of section 2-1001(a)(3).[2] Lisa, on the other hand, contends that substitution for cause was properly denied and due process was satisfied. Thus, the parties dispute the actual standard that is to be used in determining whether a petition for substitution for cause should be granted. If we were to accept John's arguments, he would win a reversal of both the appellate and circuit courts' judgments. We can therefore grant relief in this case. Moreover, notwithstanding Justice Garman's intimation to the contrary, these arguments were "squarely raised in the case." *Infra* ¶ 58 (Garman, J., specially concurring) (noting that at under Rule 316, this court is not required to answer a question if it is not squarely raised in a case). The parties are at issue, and therefore there is nothing advisory about the opinion we render today. See *La Salle National Bank v. City of Chicago*, 3 Ill. 2d 375, 379 (1954) (noting duty of the court is to "decide actual controversies"); *Air Line Pilots Ass'n, International v. UAL Corp.*, 897 F.2d 1394, 1397 (1990) (Posner, J.) ("it is cases rather than reasons that become moot").

¶ 21     The second procedural point concerns appellate jurisdiction. Lisa argues that the appellate court lacked jurisdiction because John's notice of appeal did not specify or indicate that John was seeking to appeal from the order denying the substitution for cause as is required under Supreme Court Rule 303(b)(2).

¶ 22     This court has long recognized that a notice of appeal is to be liberally construed. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433 (1979). As a result, we have held that a notice of appeal "will confer jurisdiction on an appellate court if the notice, when considered as a whole, fairly and adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal." *Id.* at 433-34 (citing *Sanabria v. United States*, 437 U.S. 54, 67 n.21 (1978)).

¶ 23     John's notice of appeal states that he was taking an appeal from the "Judgment entered by the Circuit Court for the Nineteenth Judicial Circuit, Lake County Illinois, on February 6, 2007, and all prior orders of court culminating therein to the Appellate Court–Second Judicial District." As the appellate court correctly recognized, this court has found notices

---

[2]John specifically argues that the actual prejudice standard "is no longer good law in Illinois, since that standard violates the due process clause of the Fourteenth Amendment."

of appeal to confer jurisdiction even if the order was not expressly mentioned in the notice of appeal, if that order was "a 'step in the procedural progression leading' " to the judgment which was specified in the notice of appeal. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d at 435. The denial of John's petition to substitute was a step in the procedural progression leading to the final judgment specified in John's notice of appeal. See *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d 722, 727 (1996); *In re A.N.*, 324 Ill. App. 3d 510, 512 (2001). The appellate court therefore had jurisdiction to review the order.

¶ 24    Turning to the merits, John contends that the order denying his petition must be reversed because Judge Starck erred in using an actual prejudice standard in making his ruling. As explained below, Judge Starck did not use the wrong standard in deciding John's petition.

¶ 25                    *Substitution of Judge Under Section 2-1001*

¶ 26    In Illinois, the substitution of a judge in civil and criminal cases is governed solely by statute. See 725 ILCS 5/114-5 (West 2006); 735 ILCS 5/2-1001(a) (West 2006). In civil cases, section 2-1001 of the Code of Civil Procedure is divided into subsections that set forth the various grounds under which a substitution may be granted. For example, subsection (a)(1) of section 2-1001 speaks to the "involvement" of the judge, and identifies specific situations where a substitution of judge may be awarded by the court with or without the "application" of either party. 735 ILCS 5/2-1001(a)(1) (West 2006). The specific circumstances listed in this subsection include: where "the judge is a party or interested in the action, or his or her testimony is material to either of the parties to the action, or he or she is related to or has been counsel for any party in regard to the matter in controversy." 735 ILCS 5/2-1001(a)(1) (West 2006). Under this provision of the statute, substitution of judge "may be awarded by the court with or without the application of either party." 735 ILCS 5/2-1001(a)(1) (West 2006). This means that a judge may grant a substitution under this provision *sua sponte*.

¶ 27    Section 2-1001 also provides each litigant, as a matter of right, with one substitution of judge without cause. Under this provision of the statute, the application for substitution "shall be made by motion." 735 ILCS 5/2-1001(a)(2)(ii) (West 2006). Finally, section 2-1001 further allows a litigant a substitution of judge for cause. Under this provision of the statute, every "application" for such a substitution "shall be made by petition." 735 ILCS 5/2-1001(a)(3)(ii) (West 2006).

¶ 28    We note that both the appellate court majority opinion and that of the specially concurring justice misidentify John's request for substitution of judge for cause as a "motion." See, *e.g.*, 393 Ill. App. 3d 364, 371; 393 Ill. App. 3d at 395 (O'Malley, J., specially concurring). This court, too, has been guilty of the same imprecision, most recently in *In re Estate of Wilson*, 238 Ill. 2d 519 (2010), and in *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163 (2008). As noted, the statute contemplates the use of a "motion" when seeking substitution as a matter of right and the use of a "petition" for situations in which substitution for cause is sought. The inadvertent interchange of these words in substitution cases can lead to confusion since the requirements for substitution as of right differ from those for substitution for cause. *In re Dominique F.*, 145 Ill. 2d 311, 318-19 (1991). It is for

-6-

this reason, therefore, that we take the opportunity to remind both bench and bar of the differences between the provisions of section 2-1001 and the need for care in labeling the requests for substitution brought under the various subsections of the statute.

¶ 29    With respect to subsection(a)(1), many, but not all, of the circumstances listed in it are also listed in Rule 63(C). For instance, Rule 63(C)(1)(d) mandates disqualification where the judge has an interest in the proceeding. Ill. S. Ct. R. 63(C)(1)(d) (eff. April 16, 2007). Rule 63(C)(1)(e)(i) mandates disqualification when the judge is a party to the proceeding. Ill. S. Ct. R. 63(C)(1)(e)(i). Rule 63(C)(1)(b) mandates disqualification when the judge has served as counsel for any party or may be a material witness. Ill. S. Ct. R. 63(C)(1)(b). Thus, the General Assembly has seen fit to incorporate specific portions of Rule 63 into section 2-1001, but has not seen fit to incorporate all of the rule. This, of course, is an indication of legislative intent. Certainly, if the General Assembly wanted to add all of the considerations contained in Rule 63(C) to section 2-1001(a)(3) it could have done so in subsection (a)(1) of the substitution of judge statute.

¶ 30    As noted, subsection (a)(2)(ii) of section 2-1001 directs that a litigant is entitled to one automatic substitution if the request for substitution is "presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case." 735 ILCS 5/2-1001(a)(2)(ii) (West 2006). After a substantive ruling has been made, however, subsection (a)(3) requires substitution "[w]hen cause exists." 735 ILCS 5/2-1001(a)(3) (West 2006). Although the statute does not define "cause," Illinois courts have held that in such circumstances, actual prejudice has been required to force removal of a judge from a case, that is, either prejudicial trial conduct or personal bias. *Rosewood Corp. v. Transamerica Insurance Co.*, 57 Ill. 2d 247 (1974); *In re Marriage of Kozloff*, 101 Ill. 2d 526, 532 (1984); see also *People v. Vance*, 76 Ill. 2d 171, 181 (1979). Moreover, in construing the term "cause" for purposes of a substitution once a substantial ruling has been made in a case, Illinois courts have consistently required actual prejudice to be established, not just under the current statute, but under every former version of the statute. See Ill. Rev. Stat. 1983, ch. 110, ¶ 2-1001; Ill. Rev. Stat. 1981, ch. 110, ¶ 503; Ill. Rev. Stat. 1975, ch. 146, ¶ 1; Ill. Rev. Stat. 1963, ch. 146, ¶ 1 *et seq.*; 3 Richard A. Michael, Illinois Practice §§ 13.3, 13.4 (1989) (collecting cases). The reason has been explained: "one may not 'judge shop' until he finds one in total sympathy to his cause. Any other rule would spell the immediate demise of the adversary system." *American State Bank v. County of Woodford*, 55 Ill. App. 3d 123, 128 (1977). See also Ill. Ann. Stat., ch. 110, ¶ 2-1001, Historical and Practice Notes, at 142-43 (Smith-Hurd 1983) (citing cases); 3 Richard A. Michael, Illinois Practice § 13.3 (1989) (noting that once a substantive ruling has been made, the need for actual prejudice to be shown "is based on the desire to prevent 'judge shopping' until a judge is found who is favorably disposed to the position of the litigant").

¶ 31    Judges, of course, are presumed impartial, and the burden of overcoming the presumption by showing prejudicial trial conduct or personal bias rests on the party making the charge. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). The fact, for example, that a judge has previously ruled against a party in any particular case would not disqualify the judge from sitting in a subsequent case involving the same party. *Eychaner*, 202 Ill. 2d at 280. With respect to bias based upon a judge's conduct during a trial, we have relied upon the United

States Supreme Court's description:

> " '[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' (Emphases in original.)" *Eychaner*, 202 Ill. 2d at 281 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

Thus, while most bias charges stemming from conduct during trial do not support a finding of actual prejudice, there may be some cases in which the antagonism is so high that it rises to the level of actual prejudice. Indeed, this court just recently reaffirmed its reliance on *Liteky* in *In re Estate of Wilson*, 238 Ill. 2d 519, 554-55 (2010). In any event, the law is clear in Illinois that when, as in this case, a substantial ruling has been made, substitution under section 2-1001(a)(3) may be granted only where the party can establish actual prejudice.

¶ 32 John argues that Illinois' actual prejudice standard is unconstitutional in light of a case alluded to earlier in this opinion, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009). There, the United States Supreme Court held that when a party contends that the failure to recuse violates due process, an objective inquiry must be made to determine not whether the judge is actually, subjectively biased, but whether the average judge in his position is likely to be neutral or whether there is an unconstitutional potential for bias. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2262.[3] John maintains that the utilization of the criteria set forth in Rule 63(C)(1) will eliminate due process concerns in petitions brought under section 2-1001(a)(3) of the Code, arguing that the standards set forth in Rule 63(C)(1)[4] will afford an additional level of protection for litigants and for the integrity of the adversarial process. That may be, but Rule 63(C)(1)'s standard for recusal is a mere "appearance of impropriety," which is less strict than the one identified in *Caperton*. The proper constitutional inquiry, as set forth in *Caperton*, is "whether 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual

---

[3]Prior to the issuance of *Caperton*, the United States Supreme Court had recognized only two instances where recusal is constitutionally mandated. The first is when the judge has an indirect financial interest in the outcome of the case. *Tumey v. Ohio*, 273 U.S. 510 (1927). The second instance arises in the context of criminal contempt proceedings. *In re Murchison*, 349 U.S. 133, 137-39 (1955).

[4]Rule 63(C)(1)'s direction to judges to voluntarily recuse themselves where their "impartiality might reasonably be questioned" (Ill. S. Ct. R. 63(C)(1)) includes "situations involving the appearance of impropriety." See, *e.g.*, *People v. Buck*, 361 Ill. App. 3d 923, 931 (2005); *People v. McLain*, 226 Ill. App. 3d 892, 902 (1992).

bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' " *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2263 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). Stated differently, recusal is required when the "probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47.

¶ 33    Under *Caperton*, then, a judge reviewing a for-cause challenge against another judge should assess the constitutional due process implications raised whenever substitution is sought and guard against the "risk of actual bias" (*id.*) by applying the *Caperton* standard to the facts of the case.

¶ 34                    *The Appearance of Impropriety Standard*

¶ 35    John concedes in this court that he cannot establish actual prejudice. Moreover, he makes no argument that the probability of actual bias on the part of Judge Waldeck was too high to be constitutionally tolerable. He instead asks this court to formally recognize the lower "appearance of impropriety" standard to replace the prejudice standard noted above. He maintains that Illinois case law, including a decision from this court, holds that actual prejudice need not always be the basis for for-cause substitution.

¶ 36    John initially points to two decisions of the appellate court that he claims use the appearance of impropriety approach he advocates. The first, *People v. Bradshaw*, 171 Ill. App. 3d 971 (1988), concerned a criminal trial in which the trial judge had an *ex parte* communication with the mother of the victim. One of the defendants moved for substitution of the judge, and the motion was heard by a second judge.[5] The appellate court, relying on the Judicial Code's *ex parte* communication provisions and on Rule 17 of the Circuit Court of Cook County, held that the trial judge had an obligation to recuse himself whenever necessary to protect the right of an accused to a fair and impartial trial. *Id.* at 975. The court specifically stated that there "must be a concerned interest in ascertaining whether public impression will be favorable and the rights of an accused protected even though the judge is convinced of his own impartiality." *Id.* at 976.

¶ 37    The problem with this analysis is that it fails to acknowledge that it was the second judge who, after a hearing, ruled specifically on the question of the trial judge's impartiality, not the trial judge himself. Indeed, the appellate court opinion interchanged the concepts of recusal and of substitution throughout its opinion, which indicates that the court construed the criminal substitution of judge statute (now codified at 725 ILCS 5/114-5, but not cited in the appellate court's opinion) in tandem with the Judicial Code. The court did this without citation to any legal authority. *Bradshaw* therefore does not completely answer the question of whether for-cause substitution includes the appearance of impropriety standard.

¶ 38    The second case, *In re Marriage of Wheatley*, 297 Ill. App. 3d 854 (1998), did not even address substitution for cause so it is of limited help in this case. The issue there was an *ex*

---

[5]In contrast to the civil substitution of judge statute, the substitution statute found in the Code of Criminal Procedure of 1963 provides that a party may "move" for substitution, rather than seek the relief by way of petition. See 725 ILCS 5/114-5 (West 2006).

*parte* communication, this time made in the context of a divorce case in which the issue of child custody was contested. After the trial judge announced his ruling that custody was to be awarded to the wife, he disclosed that, just two days prior to the start of the trial, he had received a letter from someone purporting to be a retired United States congressman. The judge stated that he opened the letter and noticed that it was printed on the letterhead of a retired United States congressman and concerned a divorce case that was pending before him. The judge had not yet seen the file in the case and so he did not read the letter. He "folded it up[,] replaced it in the envelope, and left it on his desk." *Id.* at 856. The judge stated he forgot about the letter until the day he rendered the decision. After preparing his order in the case, the judge rediscovered the letter. After reading the first line of the letter, the judge indicated to the parties that he "folded the letter back up and did not read any further." *Id.* at 856. The judge insisted that he never read the letter and had no idea what it contained. The husband thereafter sought to vacate the judgment on the basis that the letter was an improper *ex parte* communication designed and intended by the sender to influence the court's decision. The motion further maintained that the judge had a duty to recuse himself so as to avoid even the appearance of impropriety. The trial court denied the motion.

¶ 39    The appellate court reversed, holding that it was not the "mere receipt of the improper communication that creates the appearance of impropriety. The trial judge did not disclose the receipt of this improper communication but kept it in his office on his desk during the trial of the matter, during his deliberations on the case, and while drafting his judgment on the case." *Id.* at 858. Relying on *Bradshaw*, the court found it significant that the trial judge did not disclose the letter's existence to the parties until after the judgment was announced and that the sender of the letter (a former congressman) was the only person who advocated for the mother to be awarded custody. *Id.* Relevant for our discussion here, the case did not concern substitution for cause and did not cite to the provisions of the Judicial Code. As a result, *Wheatley* does not address the issue of whether a for-cause substitution includes the appearance of impropriety.

¶ 40    That brings us to *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163 (2008), a case in which John states that we recognized the use of the appearance of impropriety standard in the context of for-cause substitution of judge. A close reading of the case reveals that this court did no such thing. In *Barth*, the plaintiff filed a motion for substitution for cause under section 2-1003(a)(3) after the trial judge disclosed that he was insured by the defendant, State Farm.[6] The motion alleged that the economic relationship between the judge and State Farm created an appearance of impropriety. The trial judge referred the motion to another judge,

---

[6]This court's opinion states that the plaintiff "filed a motion for substitution of judge for cause under the catchall provision of Supreme Court Rule 63(C)(1)." *Barth*, 228 Ill. 2d at 167. Nowhere in the opinion is section 2-1001(a)(3) actually cited. The underlying appellate court opinion states that the plaintiff filed a "motion for substitution of judge for cause pursuant to section 2-1001(a)(3)." *Barth v. State Farm Fire & Casualty Co.*, 371 Ill. App. 3d 498, 500 (2007). Since the relief sought was a for-cause substitution, the application should have been made "by petition." Nevertheless, for consistency between opinions, in discussing *Barth* here, we will use the designation "motion" as was used in both our opinion and that of the appellate court.

and it was ultimately denied. Several months later, the trial judge filed an order to clarify that his prior referral of the motion for substitution was considered by him as a "motion for recusal" and that he intended to deny the motion by transferring it to a second judge.

¶ 41    In the appellate court, the plaintiff argued that the trial judge erred by not recusing himself because he had an ongoing economic relationship with State Farm as one of its insureds. The appellate court rejected the challenge for two reasons. First, the court noted that a different judge had heard the section 2-1001(a)(3) substitution motion and had denied it after a hearing. *Barth v. State Farm Fire & Casualty Co.*, 371 Ill. App. 3d 498, 506 (2007). However, because the transcript from the hearing was not a part of the record, and no bystander's report had been filed, the appellate court was unable to do more than summarily affirm the section 2-1001(a)(3) determination. *Id.* The appellate court then went on to consider the plaintiff's second contention, characterized by that court as "appearing" to be an argument that the original trial judge should have recused himself *sua sponte* under Supreme Court Rule 63(C)(1), which mandates disqualification where the judge has more than a *de minimis* economic interest in the proceedings. *Id.* In other words, the argument was whether the judge had an interest in the case based on his being an insured of the defendant.[7] The appellate court concluded the judge's economic interest was *de minimis*. *Id.* at 506-07.

¶ 42    This court, reviewing the appellate court's conclusions, accepted the characterization of the motions as determined by both the trial court and the appellate court. Our opinion couched the issue as one of recusal. We acknowledged that the trial judge treated the motion for substitution as an independent motion to recuse and found no error in his decision to deny it. *Barth*, 228 Ill. 2d at 175-76. We also summarily affirmed the second judge's denial of the plaintiff's for-cause motion. *Id.* at 176 ("We cannot say *** the motion judge erred by denying Barth's motion for substitution for cause."). Accordingly, *Barth* did not address, nor did the parties raise, any argument regarding the use of the Judicial Code's appearance of impropriety standard in for-cause substitution requests.

¶ 43    Addressing the issue squarely today, we reject John's invitation to replace the actual prejudice standard with the appearance of impropriety standard. To so hold would mean that the mere *appearance* of impropriety would be enough to force a judge's removal from a case. This is so because, as previously noted, Rule 63(C)(1)'s direction to judges to voluntarily recuse themselves where their "impartiality might reasonably be questioned" (Ill. S. Ct. R. 63(C)(1)) includes "situations involving the appearance of impropriety." See, *e.g.*, *People v. Buck*, 361 Ill. App. 3d 923, 931 (2005); *People v. McLain*, 226 Ill. App. 3d 892, 902 (1992). This court has included that direction for recusal under the Code of Judicial Conduct,

---

[7]Section 2-1001(a)(1) allows a substitution to be awarded by the court with or without application of either party where the "judge is *** interested in the action." 735 ILCS 5/2-1001(a)(1) (West 2006). As noted earlier, the statute tracks the language of Rule 63(C)(1)(d)'s mandate of recusal where the judge has "an interest" in the proceeding. *Barth* appears to be addressing the specific notion of an appearance of impropriety rising from an instance where the judge was accused of having an interest in the action by virtue of his relationship with the defendant. Had that interest been more than *de minimis*, substitution would have been required *not* under section 2-1001(a)(3) but would have been mandated by section 2-1001(a)(1).

but as noted earlier, the General Assembly has never seen fit to include that lower, appearance of impropriety standard in providing for the substitution of a judge once a substantive ruling in a case has been made.[8]

¶ 44    Adopting John's position would doubtless mean more for-cause petitions arguing "an appearance of impropriety," a much easier standard to meet than actual prejudice. An easier-to-meet standard would encourage the "judge-shopping" that our previous decisions carefully strove to avoid. And it is almost certain that judges in dissolution of marriage cases would see the greatest increase in judge-shopping since a cursory review of Illinois jurisprudence shows that, in civil cases, most for-cause substitution requests arise in divorce and custody cases.

¶ 45    Additionally, John's argument overlooks that recusal and substitution for cause are not the same thing. *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 681 (2008); Deborah Goldberg, James Sample, & David E. Pozen, *The Best Defense: Why Elected Courts Should Lead Recusal Reform*, 46 Washburn L.J. 503, 504 (2007). Whether a judge should recuse himself is a decision in Illinois that rests *exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code. All judges in Illinois are expected to consider, *sua sponte*, whether recusal is warranted as a matter of ethics under the Judicial Code. The Judicial Code, which is a part of our rules, says nothing that would give the impression that its provisions could be used by a party or his lawyer as a means to force a judge to recuse himself, once the judge does not do so on his own. This point is, in fact, reinforced by the Preamble to the Judicial Code: the Judicial Code is "designed to provide guidance to judges *** and to provide a structure for regulating conduct through disciplinary agencies," and its purpose "would be subverted if the Code were invoked by lawyers for mere tactical advantage." Code of Judicial Conduct, Preamble.

¶ 46    On the other hand, substitution for cause petitions under the Code are brought by a party and are decided by another judge. The fact that a second judge will examine the for-cause allegations allows for an independent, neutral assessment of the allegations against the challenged judge that comports with due process concerns. This ensures that any substitution coming after a substantive ruling has been made is the result of a proven bias or high probability of the high risk for actual bias and is not a mere ploy for tactical advantage. Under the approach advocated by John, however, the second judge would also have to consider whether the appearance of impropriety warrants a for-cause substitution, a question that the Judicial Code assigns to a judge to decide on his or her own. Indeed, as noted earlier, the legislature, in section 2-1001(a)(1), has provided for only some of the Code's provisions to serve as a basis for substitution of judge in civil cases.

---

[8]This is explained, in some part, by the different interests at play in recusal under Rule 63(C) and substitution under section 2-1001(a)(3). The Code of Judicial Conduct is aspirational and represents this court's attempt to provide for recusal provisions for the benefit of preserving the integrity of the courts on a general scale. The substitution statute represents the General Assembly's attempt to prevent bias in individual cases.

¶ 47    Finally, there is no need to engraft Rule 63(C)(3) standards onto section 2-1001(a)(3) in order to guard against a due process violation, as John maintains throughout his brief. The main reason why this is so is because John fails to put *Caperton* into perspective. The case did *not* involve the substitution of a trial judge. Rather, it concerned whether due process required that a state supreme court justice recuse himself from hearing an appeal involving a political backer who had contributed millions of dollars to that justice's election. As noted earlier, recusal and substitution for cause are not the same thing. One of the critical concerns in *Caperton* was that recusal motions are decided by the very person who is accused of bias. See *Caperton*, 556 U.S. at ___, 129 S. Ct. 2263 (acknowledging the need for adequate protections "against a judge who simply misreads or misapprehends the real motives at work" in deciding the case before him). The Court also explicitly stressed the need for due process protection in a case where the recusal question was raised on review, where there was "no procedure for judicial factfinding and the sole trier of fact is the one accused of bias." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2264.[9] These concerns are notably absent under the procedures established in the Code under section 2-1001(a)(3), which is applicable only to trial judges. Finally, the Court took great pains to stress that its decision was limited to "an extraordinary situation where the Constitution requires recusal" (*Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265) in an "exceptional case" (*Caperton*, 556 U.S. at ___, 129 S. Ct. at 2263) comprised of "extreme facts" and thus "[a]pplication of the constitutional standard implicated *** will *** be confined to rare instances." *Caperton*, 556 U. S. at ___, 129 S. Ct. at 2267.

¶ 48    *Caperton* indicates that, at the least, an independent inquiry into a challenged judge or justice's refusal to recuse, complete with a procedure for judicial factfinding, may be necessary to satisfy due process. However, our legislature has provided for such an independent inquiry under section 2-1001(a)(3) of the Code given that a different judge rules on the petition after a hearing at which the challenged judge may testify. We note that Justice Karmeier, in his special concurrence, states that he is "troubled *** by the majority's implication" that the availability of a neutral fact-finder under section 2-1001(a)(3) "in some ways offsets" the due process concerns highlighted in *Caperton* and that, if that is what we "truly mean to say," we "are mistaken." *Infra* ¶ 138 (Karmeier, J., specially concurring, joined by Kilbride, C.J.). Justice Karmeier's characterizations of our opinion are inaccurate, as we believe our opinion speaks for itself. We have acknowledged that recusal is constitutionally mandated under *Caperton* in instances where the facts reveal that there exists a high probability of the risk of actual bias on the part of the challenged judge and have alerted our trial judges to utilize *Caperton*'s standard to guard against due process violations. Having done so, we need not adopt the standards contained in Rule 63(C)(1) for use in determining for-cause substitution petitions.

---

[9]It has often been noted that the individual nature of a judge's decision to recuse creates a tension with notions of a neutral decisionmaker. After all, can one really be objective about one's own objectivity? 46 Washburn L.J. at 530. In any event, as previously pointed out, under a section 2-1001(a)(3) motion, there is, in fact, a procedure for judicial factfinding (the challenged judge may testify or submit an affidavit) and the trier of fact *is not* the one accused of bias.

-13-

¶ 49    With respect to the petition for substitution for cause at issue here, Judge Starck correctly ruled that Judge Waldeck's substitution for cause was unwarranted. No prejudice or bias on the part of Judge Waldeck has been proven, and Judge Waldeck's participation does not offend any notions of due process contemplated in *Caperton*.

¶ 50                                    *Maintenance Award*

¶ 51    An appeal under Rule 316 brings before us the " 'the whole case *** and not just a particular issue.' " *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 436 (2008) (quoting *People v. Crawford Distributing Co.*, 78 Ill. 2d 70, 73 (1979)). As indicated earlier in this opinion, John argues that the circuit court erred in awarding Lisa maintenance.

¶ 52    The propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). While John disagrees with the manner in which the trial court assessed the pertinent facts and believes that the result it reached was not fair and equitable, it is well established that an abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court. *In re Marriage of Schneider*, 214 Ill. 2d at 173. The appellate court carefully reviewed the record in this case under the appropriate legal standards and concluded that no abuse of discretion occurred. 393 Ill. App. 3d at 383-85. No purpose would be served by our covering these points again. We think it sufficient to say that John has presented nothing to persuade us that the trial court's decision to award maintenance was one that no reasonable person would have made.

¶ 53                                       Conclusion

¶ 54    For the foregoing reasons, the judgment of the appellate court is affirmed.

¶ 55    Affirmed.

¶ 56    JUSTICE GARMAN, specially concurring:

¶ 57    This case is before us pursuant to a certificate of importance under article VI, section 4(c), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, § 4(c)) and Supreme Court Rule 316 (Ill. S. Ct. R. 316 (eff. Dec. 6, 2006)). Specifically, the appellate court noted its "acknowledgment of the confused law regarding the standard for obtaining a substitution of judge" (see 393 Ill. App. 3d at 378) and asked this court to respond "[i]n light of" the United States Supreme Court's decision in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009).

¶ 58    Appeals to this court on certificate "shall lie *** upon the certification by the Appellate Court that a case decided by it involves a question of such importance that it should be decided by the Supreme Court." Ill. S. Ct. R. 316. Such appeals are "a matter of right." Ill. Const. 1970, art. VI, § 4(c). However, that an appeal reaches this court as a matter of right, rather than as a matter of our discretion, does not negate the doctrines of mootness, ripeness,

-14-

standing, or procedural default. Similarly, the certification of a question to this court does not require this court to answer the question if it is not squarely raised in the case.

¶ 59    The appellate court issued the certificate of importance upon application of the husband, John, despite having found that his "motion to substitute for cause fell far short of meeting any of the aforementioned standards," specifically the actual prejudice standard or the appearance of impropriety standard. 393 Ill. App. 3d at 378. The appellate court also concluded that he "did not allege that due process required" substitution or recusal under *Caperton*. 393 Ill. App. 3d at 381.

¶ 60    My own examination of the facts leads to the same conclusion. John now concedes that he cannot establish actual prejudice. *Supra* ¶ 35. The facts of this case are so far removed from those of *Caperton* that the due process concern underlying that decision is not implicated. Further, his allegations fail to demonstrate even the mere appearance of impropriety that might call Rule 63(C)(3) of the Code of Judicial Conduct into consideration. In effect, the appellate court requested an advisory opinion from this court.

¶ 61    I do not believe that it is appropriate for this court to address such a significant issue in a purely advisory opinion. I agree with the appellate court, which found that John could not show a basis for substitution for cause under any possible standard, and I would dismiss the appeal for lack of an actual controversy. See *In re Luis R.*, 239 Ill. 2d 295, 306 (2010) (declining to address issues on basis that we would not "pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events" (internal quotation marks omitted)). See also *La Salle National Bank v. City of Chicago*, 3 Ill. 2d 375, 379 (1954) (stating that "an appellate court will not review a case merely to decide moot or abstract questions, to establish a precedent, *** or, in effect, to render a judgment to guide potential future litigation").

¶ 62    Should the proper case eventually arise in this state, this court will have the opportunity to consider the interplay between section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)), Rule 63(C)(3) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)), and the constitutional concerns addressed by the Supreme Court in *Caperton*.

¶ 63    JUSTICE KARMEIER, specially concurring:

¶ 64    As noted by my colleagues, this case involves an action for dissolution of marriage filed by John O'Brien against his wife, Lisa, in the circuit court of Lake County. Following a trial, the circuit court dissolved the parties' marriage and awarded Lisa child support and maintenance. John appealed, arguing that Lisa should not have been granted maintenance. John also asserted that the circuit court committed reversible error when it denied a petition he had filed seeking substitution of the trial judge for cause. The appellate court rejected John's arguments and affirmed with one justice specially concurring. 393 Ill. App. 3d 364. John then petitioned for rehearing and applied for a certificate of importance (see Ill. Const. 1970, art. VI, § 4(c); Ill. S. Ct. R. 316). Although the appellate court denied the rehearing petition, it issued the certificate of importance based on its perception that Illinois law governing substitution of judges was in a state of confusion and because it was uncertain as to the effects on Illinois law of the United States Supreme Court's decision in *Caperton v.*

*A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009). After we docketed the appeal, we allowed the Illinois Chapter of the American Academy of Matrimonial Lawyers to file a friend of the court brief in support of John. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 65 Three issues are presented for our review: (1) the appropriate standards by which a judge to whom a petition for substitution has been referred should evaluate whether sufficient cause exists to grant the petition and replace the trial judge; (2) whether, under those standards, the judge who ruled on John's petition in this case properly concluded that it should be denied; and (3) if the petition was properly denied, whether the trial judge who heard the merits of the parties' dissolution proceeding erred in awarding maintenance to Lisa.

¶ 66 I am in full agreement with the majority's discussion and resolution of the third issue. I also agree completely with the majority's conclusion that John's petition for substitution was properly denied. In my view, however, the majority's discussion of the relevant facts is incomplete, its statement of the case is flawed, and its interpretation of the relevant Illinois statutes and judicial precedent is erroneous. Contrary to the majority, I do not believe that a judge to whom such a section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)) motion has been referred for hearing is limited to consideration of whether there is either actual bias on the part of the judge named in the petition or a probability of actual bias so extreme as to offend due process under the United States Constitution. Following precedent from this court and others, I would hold that the standards set forth in Rule 63(C)(1) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)) may also be taken into account when determining whether a petition for substitution for cause should be allowed. I therefore write separately.

¶ 67                                                   BACKGROUND

¶ 68 The events pertinent to this appeal began in November of 2003, when John was charged with domestic battery following an altercation with Lisa. Judge Joseph Waldeck, who, at the time, was assigned to hear domestic violence cases in Lake County, presided over an evidentiary hearing in the case. Judge Waldeck heard testimony from both John and Lisa and ultimately ruled, over John's objection, that certain evidence would be admitted. After Judge Waldeck rendered his decision, the battery case was tried on the merits before a different judge. At the conclusion of the trial, John was found not guilty.

¶ 69 The same month he was charged with domestic battery, John filed a petition to dissolve his marriage to Lisa. Orders regarding financial, custody, and visitation arrangements were subsequently entered by the court, including orders that John pay Lisa temporary maintenance and child support during the proceedings. Several motions concerning visitation were filed by John. Motions regarding child support and day-care expenses were filed by Lisa.

¶ 70 Following various developments not relevant here, the cause was reassigned to a different judge. The new judge happened to be Judge Waldeck. At the outset of a March 8, 2005, hearing on a motion by John to modify temporary child support, Judge Waldeck noted that the parties had previously been before him in the domestic battery case. John's lawyer stated on the record that neither he nor his client objected to Judge Waldeck continuing to preside

-16-

over the dissolution action. According to John's lawyer, there was nothing that would require the judge to recuse himself. Lisa's attorney likewise had no objection to Judge Waldeck's continued participation in the case.

¶ 71    Nearly a year later, on January 3, 2006, John petitioned for a substitution of judge pursuant to section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)). As grounds for that petition, John asserted that Judge Waldeck was "prejudiced and biased" against him as a result of (1) the judge's involvement in the earlier domestic battery case, (2) the judge's membership in a health club where Lisa worked part time and his exchange of greetings with her at the club "on more than one *** occasion," and (3) the fact that John had observed Lisa "waving to [the judge] in an inappropriate manner, indicating her familiarity with and friendliness toward [him]." John further argued that Judge Waldeck was biased against his attorney.

¶ 72    John's petition was heard by Judge Christopher Starck. During that hearing, John called Lisa as an adverse witness. Lisa testified that she worked in the fields of accounting and finance. In addition to her principal employment for a commercial real estate company, she also did part-time accounting work for a fitness club. At the time of the hearing, she had worked for the fitness club for more than 12 years.

¶ 73    Lisa testified that Judge Waldeck was a member of the club. On one occasion, in the summer of 2005, she saw the judge as she was walking to her car in the fitness club's parking lot. She said hello to him and he said "hi" back. There was no further conversation. Lisa testified that she did not approach the judge and did not believe the judge knew who she was.

¶ 74    According to Lisa, a similar encounter took place several weeks later. Lisa saw the judge in the parking lot as she was leaving the fitness club and the judge was entering. She said hello to him. He said hello in return. No further conversation occurred.

¶ 75    Lisa stated that the amount of time she spent at the fitness club was limited. She devoted approximately two hours per week to fitness club business and most of that was done in her home. She did not exercise at the club, did not recall encountering Judge Waldeck there again after the two incidents just described, and denied the suggestion that she had told John that she had contact with the judge outside the courtroom.

¶ 76    After Lisa testified, John took the stand himself. He explained where he lived and what he did for a living. He then recounted certain details regarding his 2003 prosecution for domestic battery. According to John, he appeared before Judge Waldeck "[p]robably up to ten times" in the course of those proceedings. The principal issue on which Judge Waldeck was called upon to rule concerned the admissibility of a tape recording made by Lisa. Judge Waldeck determined that the tape was admissible in the domestic battery case. The cause then proceeded to trial before Judge Terrence Brady. At the conclusion of that trial, John was found not guilty.

¶ 77    John recalled that he petitioned for dissolution of his marriage to Lisa shortly after the domestic battery case concluded. The judge initially assigned to the dissolution proceedings was named Neddenriep. Judge Neddenriep was eventually assigned to handle a different docket, and Judge Waldeck was given responsibility for John and Lisa's divorce.

¶ 78    John testified that after Judge Waldeck entered the case, he and Lisa had a lengthy

-17-

telephone conversation regarding the details of child visitation. John stated that during the course of the conversation, he complained that whenever there was "any leeway in Lisa's favor," Judge Waldeck had ruled for her. According to John, Lisa "sort of giggled" in response and told him "yes, that's true" and "[my lawyer] and I are taking care of the judge." John further testified that his previous lawyer had told him that during a meeting in chambers, Judge Waldeck had indicated to counsel for the parties that Lisa had approached him on several occasions at the fitness club.

¶ 79    Finally, John described an incident which occurred in December of 2005 when he was present in court in connection with the dissolution proceedings. Judge Waldeck was presiding and John was seated on the right-hand side of the public gallery, facing the court. Lisa was seated on the left-hand side of the gallery. At one point Lisa rose to leave the courtroom. As she did, John claimed, "she looked ahead of her toward the bench, and in a very cutesy way did this, literally in that position with the head tilted and the cutesy sort of wave." John believed Lisa's actions were directed toward Judge Waldeck. He did not see what, if any, reaction the judge had to the wave. Based on the foregoing incidents, however, John was of the opinion that Lisa and Judge Waldeck had a "very close relationship."

¶ 80    On cross-examination, John admitted that the affidavit he had submitted in support of his petition for substitution made no mention of the conversation with Lisa in which she is alleged to have claimed that she and her lawyer had "taken care" of Judge Waldeck and that the petition to substitute was not filed until the year after the conversation, which Lisa denied having, was claimed to have taken place. John further acknowledged that Judge Waldeck had, in fact, made numerous rulings in his favor, including allowing him to have visitation with his son notwithstanding the fact that he was subject to an order of protection and had recently been taken by the police to a mental-health facility, involuntarily, for evaluation.

¶ 81    Following the close of John's evidence, Lisa moved that John's petition for substitution be denied. Judge Starck granted her request and denied the petition. Judge Starck found that under the evidence presented, the only contact between Lisa and Judge Waldeck consisted of the exchange of greetings on the fitness club parking lot. The judge found it difficult to understand exactly what, "if anything at all," happened when Lisa allegedly waved at Judge Waldeck in court, but noted that whatever the circumstances, they were known by John "well before [the petition to substitute] was filed." Judge Starck found that the evidence did not support John's claim that Judge Waldek always ruled against him. He held that there was no proof that "Judge Waldeck in any way is prejudiced against [John]." He also considered and rejected John's argument that substitution was necessary in order to avoid the appearance of impropriety.

¶ 82    After the petition to substitute was denied by Judge Starck, John and Lisa next appeared before Judge Chris Stride in the context of another motion for protective order requested by Lisa. Following a lengthy hearing, Judge Stride denied Lisa's motion. The matter then returned to Judge Waldeck for resolution of various matters relating to dissolution of the marriage, including child support and maintenance. Judge Waldeck ultimately determined that John was responsible for $1,084 in biweekly child support payments and $500 in biweekly maintenance payments for 36 months.

¶ 83    John moved for reconsideration. When that motion was denied, John appealed to the appellate court. His appeal presented two issues: (1) whether the circuit court erred in denying his petition for substitution of the trial judge for cause, and (2) whether the court erred in awarding maintenance to Lisa.

¶ 84    After considering and rejecting John's motion to strike a portion of Lisa's brief and denying a motion by Lisa to dismiss the appeal for lack of jurisdiction, the appellate court reviewed existing precedent relevant to petitions for substitution of judge. As it construed the case law, a showing of actual prejudice is generally required in order to prevail on such petitions. It noted, however, that other authority has recognized that a change of judge is also warranted in circumstances where, to an objective, reasonable person, the judge's continued participation in the case would present the appearance of impropriety in violation of Rule 63(C)(1) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)). The court further observed that in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009), the United States Supreme Court concluded that due process requires recusal of a judge, even in the absence of actual prejudice or bias, in extreme cases where circumstances create a serious risk of actual bias based on objective and reasonable perceptions. 393 Ill. App. 3d at 373-78.

¶ 85    In view of this precedent, the appellate court opined that a tension exists in the case law. It concluded, however, that resolution of that tension was not necessary to a decision in this case because, under any of the standards, John's petition for substitution fell "far short." 393 Ill. App. 3d at 378. Based on the record before it, the appellate court held that the circuit court's conclusion that John had failed to prove that Judge Waldek was actually prejudiced against him was not against the manifest weight of the evidence. The court further held that the case did not present a situation where an objective, reasonable person would have questioned the trial judge's ability to rule impartially. 393 Ill. App. 3d at 378-80. Finally, the court concluded that even if John had claimed a due process violation, which he did not, the circumstances here did not rise to the level where disqualification was required under the principles articulated in *Caperton*. 393 Ill. App. 3d at 381.

¶ 86    With the challenge to the petition for substitution thus resolved, the appellate court turned to the issue of whether the circuit court had erred in awarding maintenance to Lisa. After undertaking a detailed review of the evidence in light of the governing law, the appellate court concluded that the award of maintenance to Lisa was not an abuse of discretion. It therefore affirmed the circuit court's judgment. 393 Ill. App. 3d at 381-84. One member of the appellate court specially concurred. He agreed that the circuit court's judgment should be affirmed, but criticized the reasoning employed by the majority in affirming denial of the petition for substitution as "inconsistent and indirect." 393 Ill. App. 3d at 395 (O'Malley, J., specially concurring).

¶ 87    John petitioned for rehearing and filed an application for a certificate of importance (see Ill. Const. 1970, art. VI, § 4(c); Ill. S. Ct. R. 316). As noted earlier in this separate opinion, the appellate court denied rehearing but issued a certificate of importance because it believed that Illinois law governing substitution of judges was in a state of confusion because it was uncertain as to the effects on Illinois law of the United States Supreme Court's decision in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009). It is in this posture that the matter now comes before us.

¶ 88                                         ANALYSIS

¶ 89        The petition to substitute at issue in this case was predicated on section 2-1001(a)(3) of
the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)), which governs requests
for substitution of judges, for cause, in civil cases pending in the circuit court. If a petition
presented under section 2-1001(a)(3) meets various threshold requirements, the trial judge
who is the subject of the petition is required to refer it to another judge for "a hearing to
determine whether the cause [for substitution] exists." 735 ILCS 5/2-1001(a)(3)(iii) (West
2006); see *In re Estate of Wilson*, 238 Ill. 2d 519 (2010).

¶ 90        No question is raised in this case as to whether the petition filed by John met the
necessary threshold requirements. The issues before this court are: (1) the appropriate
standards by which a judge to whom a petition for substitution has been referred should
evaluate whether sufficient cause exists to grant the petition and replace the trial judge; (2)
whether, under those standards, the judge who ruled on John's petition in this case properly
concluded that it should be denied; and (3) if the petition was properly denied, whether the
trial judge who heard the merits of the parties' dissolution proceeding erred in awarding
maintenance to Lisa. Because I agree with the majority's analysis and resolution of the third
issue, the following discussion will address only issues one and two.[10]

¶ 91        The "substitution for cause" provisions set forth in section 2-1001(a)(3) are relatively
new. They were added to the Code of Civil Procedure when section 2-1001 was rewritten by
the General Assembly in 1993. Prior to that time, section 2-1001 spoke in terms of "change
of venue," just as section 2-1001.5 of the Code (735 ILCS 5/2-1001.5 (West 2006)) does
today. It permitted cases to be heard by another judge when the initial judge had some
involvement in the case, *e.g.*, where the judge was "a party or interested in the action." Ill.
Rev. Stat. 1991, ch. 110, ¶ 2-1001(a)(1). It also permitted cases to be heard in another county
or by another judge if a party or his or her attorney feared that the party would not receive
"a fair trial in the court in which the action is pending, because the inhabitants of the county

_____

[10]As indicated earlier, Lisa also raised an objection to the appellate court's jurisdiction to
consider the merits of John's challenge to the circuit court's denial of his petition for substitution
of judge. While I agree with the majority that the jurisdictional challenge was meritless, the
majority's analysis omits a point raised by Lisa which deserves mention. It concerns a decision by
the appellate court in *Neiman v. Economy Preferred Insurance Co.*, 357 Ill. App. 3d 786, 790-91
(2005). Lisa correctly points out that in *Neiman*, the appellate court held that an order allowing a
petition to substitute could not be characterized as a step in the procedural progression leading to an
order granting, in part, a motion to dismiss, and a subsequent order granting a motion for summary
judgment. *Neiman v. Economy Preferred Insurance Co.*, 357 Ill. App. 3d at 790-91. While Lisa urges
us to follow *Neiman* and reach the same conclusion here, the circumstances of this case are different.
In contrast to *Neiman*, the circuit court in this case did not allow the petition for substitution; it
*denied* the petition. Our appellate court has consistently recognized that the denial of a petition to
substitute is a step in the procedural progression leading to final judgment and may therefore be
challenged on appeal even where, as here, it was not specifically mentioned in the notice of appeal.
See *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d 722, 727 (1996); *In re A.N.*, 324 Ill.
App. 3d 510, 512 (2001).

are or the judge is prejudiced against him or her, or his or her attorney." Ill. Rev. Stat. 1991, ch. 110, ¶ 2-1001(a)(2). In the first instance, the court could award a change of venue "with or without the application of either party." In the second situation, a change of venue could be awarded only on application by a party as provided in the statute, or by consent of the parties.

¶ 92 The version of section 2-1001(a) in effect prior to 1993, with its focus on whether the judge had some personal involvement with the action or the judge or the inhabitants of the county were prejudiced against a party, had antecedents dating back to the earliest years of Illinois' statehood. See 735 ILCS Ann. 5/2-1001, Historical and Statutory Notes, at 168 (Smith-Hurd 2003). It also had and continues to have parallels in this state's criminal code. Sections 114-5(a) through (c) of the current version of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-5(a) through (c) (West 2006)), which regulate motions for automatic substitution of judges in criminal cases (see, *e.g.*, *People v. Jones*, 123 Ill. 2d 387, 402 (1988)), expressly incorporate a prejudice standard into their provisions. Similarly, section 114-6 of the Code of Criminal Procedure (725 ILCS 5/114-6 (West 2006)), which deals with motions in criminal cases for "change of place of trial," specifically establishes as its touchstone whether the inhabitants of a county are prejudiced against the defendant.

¶ 93 The concept that a party should be able to apply for and receive a substitution of judge in a trial court proceeding for reasons other than prejudice or the judge's personal involvement in the action was unknown in Illinois until promulgation of the Code of Criminal Procedure, when the General Assembly adopted what was then section 114-5(c) of the statute (Ill. Rev. Stat. 1965, ch. 38, ¶ 114-5(c)). Now codified as section 114-5(d) of the Code of Criminal Procedure (725 ILCS 5/114-5(d) (West 2006)), the statute introduced a mechanism for substitution of a judge in criminal cases in addition to the automatic substitution provisions set forth in the preceding subsections of the law. In contrast to the automatic substitution rules, which apply where the defendant, if there is only one defendant (725 ILCS 5/114-5(a) (West 2006)); any additional defendants, if there is more than one defendant (725 ILCS 5/114-5(b) (West 2006)); or the State (725 ILCS 5/114-5(c) (West 2006)), believes that the judge is so prejudiced against the moving party that the party cannot receive a fair trial, section 114-5(d) now provides that a motion to substitute judge may be based on "cause."

¶ 94 When the General Assembly revised the venue rules governing civil cases in 1993, it retained the prejudice standard for cases where a party believes that he or she may not receive a fair trial because the inhabitants of the county may be prejudiced against him or her or his or her attorney. See 735 ILCS 5/2-1001.5(a) (West 2006). It also continued to provide a mechanism for allowing civil cases to be heard by a different judge where the original trial judge had some personal interest or involvement in the action. See 735 ILCS 5/2-1001(a)(1) (West 2006). At the same time, however, it introduced into civil actions two procedures adapted from the Code of Criminal Procedure: (1) motions for substitution of judge as a

-21-

matter of right (735 ILCS 5/2-1001(a)(2) (West 2006)), an analog to the Code of Criminal Procedure's automatic substitution provisions; and (2) petitions for substitution of judge for "cause" (735 ILCS 5/2-1001(a)(3) (West 2006)), which parallel the Code of Criminal Procedure's substitution for "cause" provision (725 ILCS 5/114-5(d) (West 2006)).

¶ 95        Section 2-1001(a)(3) of the Code of Civil Procedure does not define when sufficient "cause" exists to warrant substitution of a judge. Because the term "cause" is not defined, established principles of statutory construction direct us to assume that the legislature intended the term to have its ordinary and popularly understood meaning. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). We must further assume that the legislature's decision to use the term "cause" as in section 114-5(d) of the Code of Criminal Procedure, rather than the term "prejudice" as in sections 114-5(a) through (c) of the Code and section 2-1001.5 of the Code of Civil Procedure or "involvement" or "interest" as in section 2-1001(a)(1) of the Code of Civil Procedure, was deliberate and significant, for "[i]t is a basic rule of statutory construction that, 'by employing certain language in one instance and wholly different language in another, the legislature indicates that different results were intended.' *In re K.C.*, 186 Ill. 2d 542, 549-50 (1999)." *In re Mary Ann P.*, 202 Ill. 2d 393, 409 (2002).

¶ 96        The difference between "cause" and "prejudice" has been noted by our appellate court when construing section 114-5 of the Code of Criminal Procedure. In *People v. Lagardo*, 82 Ill. App. 2d 119, 128-29 (1967), the court recognized that the requirement of cause could be satisfied through properly supported allegations of prejudice, but observed that the "word 'cause' is a generic term of broad import." *Id.* at 128. According to the court, it means "a reason, a ground for producing a given effect, relating to a material matter, etc." *Id.*

¶ 97        No rule of statutory construction supports a more restrictive interpretation of the term in the context of petitions to substitute under section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)). To the contrary, construing "cause" in a more limited way than its plain and ordinary meaning would suggest would violate the well-established principle that a court may not add provisions that are not found in a statute, nor may it depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express. *Madison Two Associates v. Pappas*, 227 Ill. 2d 474, 495 (2008). Such a construction would also be incompatible with the rule, which also governs motions to substitute in criminal cases (see *People v. Jones,* 197 Ill. 2d 346, 352 (2001)), that the substitution of judge provisions in section 2-1001 are to be liberally construed and should be interpreted "to effect rather than defeat the right of substitution." *In re Estate of Gagliardo*, 391 Ill. App. 3d 343, 346 (2009).

¶ 98        Consistent with the more expansive construction of "for cause," our appellate court has recognized that actual prejudice is not the only basis for obtaining a substitution of judge under section 114-5(d) of the Code of Criminal Procedure. Substitution of judge may also be sought and awarded where the trial judge's continued participation in the case would offend the appearance of impropriety standards set forth in Rule 63(C)(1)) of the Code of

-22-

Judicial Conduct (Ill. S. Ct. R. 63(C)(1)). See *In re Moses W.*, 363 Ill. App. 3d 182 (2006). Similarly, when applying section 2-1001(a)(3), the civil counterpart to section 114-5(d), our court has recognized that when assessing whether cause for substitution exists, the judge to whom the petition for substitution has been transferred may also consider the standards set forth in Rule 63(C)(1) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)). *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 176 (2008).

¶ 99 Our prior decisions do not hold otherwise. In *In re Marriage of Kozloff*, 101 Ill. 2d 526, 532 (1984), we recognized that a party is always entitled to a change of judge, even after a substantial ruling has been made in the case, if the party can demonstrate actual prejudice and the petition to substitute is made at the earliest possible moment after the prejudice is discovered. Our decision did not, however, consider or decide whether actual prejudice was the only basis for establishing cause under section 2-1003(a)(3). It could not have. At the time we issued our opinion in *Kozloff,* the controlling law was phrased in terms of "prejudice" and "undue influence." Section 2-1001(a)(3) and its "cause" standard was not yet in effect and would not become law for another nine years.

¶ 100 *Rosewood Corp. v. Transamerica Insurance Co.*, 57 Ill. 2d 247 (1974), is similarly inapposite. It dealt with the question of whether, under the former Venue Act (Ill. Rev. Stat. 1969, ch. 146), a party in a civil case could seek a change of judge from multiple judges in a single application based on a general allegation of prejudice. Looking to the language of the Venue Act which, like the current venue statute (735 ILCS 5/2-1001.5 (West 2006)), was phrased in terms of "prejudice" and "undue influence," rather than "cause," the court held that while "[c]learly the statute in question authorizes an absolute right to a change of venue from a single judge based on the general allegation of prejudice in the petition *** [it] now contains no language which indicates that the legislature contemplated a change of venue from more than one judge in civil cases based on such a general allegation."*Rosewood Corp.*, 57 Ill. 2d at 253. To obtain a change of more than one judge based on a claim of prejudice under the statute, the court held, a party must submit an application containing "specific allegations to support the charges of prejudice against the additional judges." *Id.* at 254. Nothing in that holding, however, can fairly be construed as suggesting that actual prejudice is required before a petition for substitution for cause may be granted under section 2-1001(a)(3). As was the case when *Kozloff* was decided, section 2-1001(a)(3)'s cause standard was not in effect at the time we ruled in *Rosewood Corp.*, and was therefore not before us.

¶ 101 Our appellate court's decision in *American State Bank v. County of Woodford*, 55 Ill. App. 3d 123 (1977), is likewise distinguishable. At issue in that case was whether a party had an absolute right to a change of judge under the former Venue Act without having to plead and prove specific grounds to support its application, even after the judge had ruled on a substantive issue in the case. In reaching the wholly unremarkable conclusion that the absolute right to a change of judge ended once the judge had ruled on a substantive issue, the opinion did refer to "prejudice," but once again that was because "prejudice" was the

standard under the statute then in effect. Section 2-1001(a)(3)'s "cause" standard was still 15 years in the future. Accordingly, there is nothing in the opinion that can be understood as holding that the term "cause" in section 2-1001(a)(3) can mean actual prejudice and only actual prejudice.

¶ 102     *People v. Vance*, 76 Ill. 2d 171 (1979), is distinguishable as well. It addressed the character of proof necessary to establish actual prejudice under the version of section 114-5(c) of the Code of Criminal Procedure of 1963 then in effect. While that version of the statute included a "cause" provision as section 114-5(d) does today, our opinion did not purport to consider what other forms of "cause," in addition to actual prejudice, might suffice to warrant allowance of a motion to substitute, and it certainly did not consider whether a petition to substitute under section 2-1001(a)(3) (735 ILCS 5/2-1001(a)(3) (West 2006)) could be predicated on a claim that the trial judge's continued participation in the case would violate the standards set forth in Rule 63(C)(1) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)). The issue was simply not before the court. Indeed, given that the Code of Judicial Conduct did not even take effect until January of 1987, it would have been impossible for the court to have considered applicability of current Rule 63(C)(1).

¶ 103     *People v. Jones*, 219 Ill. 2d 1, 18 (2006), a more recent decision, did state that in order to prevail on a motion for substitution under section 114-5(d) of the Code of Criminal Procedure, a defendant must demonstrate that there are facts and circumstances which indicate that the trial judge was prejudiced. That statement, however, must be read in the context in which it was made. We spoke of actual prejudice in *Jones* because allegations of actual prejudice were the basis for the motion to substitute asserted by the defendant. Whether the statute's "cause" standard could be satisfied on grounds other than actual prejudice was not before us.

¶ 104     A similar point can be made regarding *In re Estate of Wilson*, 238 Ill. 2d 519 (2010), our latest pronouncement on petitions for substitution under section 2-1001(a)(3). That decision discussed, among other things, the type of bias which must be alleged where bias or prejudice is invoked as the basis for seeking substitution. *Id.* at 554. Nowhere, however, did it suggest that actual prejudice is the only cognizable basis for seeking substitution of judge under section 2-1001(a)(3).

¶ 105     While none of the foregoing authorities dealt with the issue of whether an application for substitution of judge for cause under section 2-1001(a)(3) may be predicated on grounds other than actual prejudice, the issue was before us in *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163 (2008), a case I have just noted. In *Barth*, Rule 63(C)(1) of the Code of Judicial Conduct (Ill. S. Ct. R. 63(C)(1)) was specifically invoked as the basis for a petition to substitute under section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)). Applying the standards set forth in Rule 63(C)(1)–and no others–we held that the circuit court did not err in denying the petition to substitute. That decision was unanimous.

-24-

¶ 106    *Barth* was decided three years ago. Since that time, it has not been overruled or even questioned by our court. It continues to represent the law in Illinois. Under *stare decisis*, prior decisions should not be set aside absent special justification. *Iseberg v. Gross*, 227 Ill. 2d 78, 101 (2007). That is especially true in cases such as this involving statutory interpretation. As we recently reiterated, " '[c]onsiderations of *stare decisis* weigh more heavily in the area of statutory construction *** because such a departure *** amounts to an amendment of the statute itself rather than simply a change in the thinking of the judiciary with respect to common law concepts which are properly under its control.' " *People v. Williams*, 235 Ill. 2d 286, 295 (2009) (quoting *Froud v. Celotex Corp.*, 98 Ill. 2d 324, 336 (1983)). No special justification for departing from *stare decisis* has been demonstrated here. For reasons which will be discussed presently, concerns over use of Rule 63(C)(1)'s standards in evaluating applications for substitution of judge under section 2-1001(a)(3) have no basis in experience or the law.

¶ 107    In contrast to the actual prejudice standard, which looks at circumstances as they actually are, the criteria set forth in Rule 63(C)(1) center on circumstances as they appear to be from the standpoint of an objective, reasonable person. Under Rule 63(C)(1), disqualification is mandated when a reasonable person might question the judge's ability to rule impartially. *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d at 176.

¶ 108    The appellate justice who wrote the special concurrence in the case before us thought it problematic that Illinois law supports a finding of cause under section 2-1001(a)(3) based on either actual prejudice or the objective appearance of bias as described in Rule 63(C)(1). This concern is unfounded. Contrary to the concurring appellate justice's view, allowing the circuit court to utilize the criteria set forth in Rule 63(C)(1) when assessing whether a petition to substitute should be granted will not render the actual prejudice standard meaningless. Where a litigant can prove that the trial judge is actually prejudiced against him, the need to assess objective appearances under Rule 63(C)(1) is eliminated. If, on the other hand, actual prejudice cannot be established, the standards set forth in Rule 63(C)(1) afford an additional level of protection for litigants and for the integrity of the adversarial process. In this way, the two standards are not in conflict. Rather, they serve to complement one another.

¶ 109    The concurring appellate justice correctly noted that Rule 63(C)(1) was enacted as part of this state's Code of Judicial Conduct and that the Code's preamble states:

> "The Code is designed to provide guidance to judges and candidates for judicial office and to provide a structure for regulating conduct through disciplinary agencies. It is not designed or intended as a basis for civil liability or criminal prosecution. Furthermore, the purpose of the Code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding." Ill. S. Ct. Rules, Preamble, Code of Judicial Conduct (eff. Aug. 6, 1993).

Based on this language, the concurring appellate justice questioned whether Rule 63(C)(1)

"was meant as a direct means of relief to be pursued by litigants." 393 Ill. App. 3d at 389 (O'Malley, J., specially concurring).

¶ 110    The rules of this court are interpreted under the same principles governing the interpretation of statutes. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). One of those principles is that a declaration of policy or a preamble is not a part of the enactment itself and has no substantive legal force. *People v. McCarty*, 223 Ill. 2d 109, 131 (2006). It can, however, be a useful guide to the enacting body's intention in promulgating a provision. *Primeco Personal Communications, L.P. v. Illinois Commerce Comm'n*, 196 Ill. 2d 70, 87 (2001). Such is the case here. Our court considered and approved the language of the preamble cited by the concurring appellate justice when it adopted the Code of Judicial Conduct, and I continue to regard it as an accurate statement of our view of the meaning and effect of the Code's provisions.

¶ 111    Having said that, I do not believe that anything in the preamble precludes reference to the standards set forth in Rule 63(C)(1) when evaluating whether a petition for substitution of judge should be granted under section 2-1001(a)(3) (West 2006) of the Code of Civil Procedure. Where, as here, a statutory petition to substitute has been filed, Rule 63(C)(1) does not operate as a "basis for civil liability or criminal prosecution," nor does it provide a mechanism for enabling counsel to obtain "mere tactical advantage in a proceeding." Rather, it provides a set of criteria to help guide the judge to whom the petition for substitution has been referred in evaluating whether the petition should be granted.

¶ 112    This is an entirely proper use of the rule. Indeed, providing guidance regarding the standards for judicial conduct is the quintessential function of the Code of Judicial Conduct. See Ill. S. Ct. Rules, Preamble, Code of Judicial Conduct (eff. Aug. 6, 1993). Moreover, by permitting reference to the Judicial Code's standards when evaluating whether a petition to substitute for cause should be granted under section 2-1001(a)(3) of the Code of Civil Procedure, we foster consistency between the standards by which judges are expected to regulate their own conduct and the standards by which their conduct is evaluated by others.

¶ 113    To be sure, complete consistency between how the Code of Judicial Conduct is interpreted for purposes of judicial discipline and how it is applied in the context of petitions to substitute cannot be guaranteed. Disciplinary matters, after all, fall within the exclusive province of the Courts Commission, an independent body whose decisions are ordinarily not subject to review by this court. Ill. Const. 1970, art. VI, § 15; *People ex rel. Judicial Inquiry Board v. Courts Comm'n*, 91 Ill. 2d 130, 134 (1982). The potential for discrepancies in interpretation is not, however, a persuasive basis for disallowing reference to provisions of the Code of Judicial Conduct in the context of petitions for substitution of judge.

¶ 114    Contrary to the concerns expressed by some, there is no merit to the notion that it might impermissibly usurp the functions of the Judicial Inquiry Board and the Courts Commission or subject judges to heightened disciplinary peril if we permitted one judge to assess whether another judge's participation in a case would contravene provisions of the Judicial Canons.

-26-

I say this for several reasons. First, the Courts Commission is not bound by rulings made by the courts regarding compliance with the Judicial Canons. As I have just suggested, for purposes of judicial discipline, the Commission makes its own determination as to whether the rules have been violated in a particular case, and that determination is final and unreviewable. *People ex rel. Judicial Inquiry Board v. Courts Comm'n*, 91 Ill. 2d 130, 135-36 (1982); Ill. Const. 1970, art. VI, § 15(f).

¶ 115 Second, a conclusion that the Judicial Canons have been violated does not automatically result in punishment of the judge in question even when that determination is made by the Courts Commission itself. Under the judicial article of the 1970 Constitution, the Courts Commission has authority to take adverse action against a judge or associate judge only "for willful misconduct in office, persistent failure to perform his or her duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute." Ill. Const. 1970, art. VI, § 15(e). If the Commission determines that misconduct is *de minimis* or that a violation is not substantial, the complaint will be dismissed. See, *e.g.*, *In re Scrivner*, 3 Ill. Cts. Comm'n 6, 9 (1993); *In re Alfano*, 2 Ill. Cts. Comm'n 11, 27-28 (1982); *In re Nielsen*, 2 Ill. Cts. Comm'n 1, 8-9 (1981); *In re Campbell*, 1 Ill. Cts. Comm'n 164, 171-72 (1980).[11]

¶ 116 Third, concerns over judicial discipline fail to consider the realities of the process. When a proper petition for substitution under section 2-1001(a)(3) is filed by a litigant who believes that a trial judge's continued participation in a case offends the standards set forth in Rule 63(C)(1), the original trial judge will end his or her involvement in the proceedings unless and until it is determined by the judge to whom the petition has been referred–a judge presumed to be neutral–that the trial judge's continued participation in the case would not violate Rule 63's standards. See 735 ILCS 5/2-1001(a)(3)(iii) (West 2006). If the judge hearing the petition determines that Rule 63 does not bar the trial judge from continuing, the trial judge will have what will surely be a compelling defense should a litigant subsequently

---

[11]Although not every violation of the Judicial Canons will result in imposition of discipline, I would counsel members of the Judicial Branch that they should not take literally the majority's characterization of the Code of Judicial Conduct as "aspirational." *Supra* ¶ 43 n.8. Supreme court rules are most definitely not aspirational (*Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002) (quoting *Bright v. Dicke*, 166 Ill. 2d 204, 210 (1995))), and the supreme court rules comprising the Code of Judicial Conduct are no exception. "The Code is designed to *** provide a structure for regulating [judicial] conduct through disciplinary agencies [and] [t]he text of the rules is intended to govern conduct of judges and to be binding upon them." Ill. S. Ct. Rules, Preamble, Code of Judicial Conduct (eff. Aug. 6, 1993). Not only does the Code obligate judges to conform their own conduct to the standards set forth therein, it requires them to "take or initiate appropriate disciplinary measures" whenever they have knowledge of a violation of the Code by another judge. Ill. S. Ct. R. 63(B)(3)(a).

elect to initiate disciplinary charges. If the judge hearing the petition determines that Rule 63 does bar the trial judge from continuing, the trial judge will no longer be involved in the case, thus insuring that the litigants' interests will be protected and that no one involved in the case will be harmed. Such a result can only enhance the integrity of the process, reducing, rather than increasing, the likelihood of sanctionable misconduct.

¶ 117　　Any worries over potential disciplinary problems should be further assuaged when one considers that when hearing a petition to substitute under section 2-1001(a)(3), the judge to whom the petition was referred may well have more evidence before him on the question of whether the trial judge's continued participation in the case would violate Rule 63's standards than was available to the trial judge himself. Where such evidence is adduced, it may provide the judge who is hearing the petition with a more accurate perspective on the litigation, and the trial judge's role in it, than the trial judge was able to achieve based on his own, more limited personal knowledge and subjective feelings. In light of these differences in information, a determination by the judge hearing the petition that there is merit to a petition to substitute based on Rule 63's standards does not necessarily mean that the trial judge erred ethically or otherwise by failing to recuse himself *sua sponte*.

¶ 118　　But perhaps the strongest response to concerns over potential disciplinary problems is that use of Rule 63's standards in petitions for substitution has simply not proven to be problematic in practice. To the contrary, as our decision in *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, reflects, the courts have found the provisions of the Code of Judicial Conduct an eminently useful guide when resolving petitions for substitution of judge in situations not involving actual prejudice. So far as I can tell, their use of the Code's provisions in determining whether "cause" exists for substitution of a trial judge under section 2-1001(a)(3) of the Code of Civil Procedure has created no new disciplinary problems for any of the judges involved.

¶ 119　　One cannot oppose use of Rule 63's criteria in evaluating whether cause for substitution exists under section 2-1001(a)(3) on the theory that responsibility for determining whether a judge should continue to preside over a case under the standards set forth in Rule 63 should be vested exclusively in the individual judge. The law may presume that judges are impartial (*Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002)), but there is no presumption that they are in the best position to make an objective assessment of whether their own actions present an appearance of impropriety. To the contrary, individual judges may often be in the worst position to make such assessments. See Deborah Goldberg, James Sample & David E. Pozen, *The Best Defense: Why Elected Courts Should Lead Recusal Reform*, 46 Washburn L.J. 503, 530 (2007) ("The challenged judge may have the best knowledge of the facts, but the very biases or conflicts of interest that prompted the challenge in the first place may prevent her from fairly evaluating the import of those facts."). The robes of office, after all, confer no special exemption from the very basic human trait that it is difficult for people to see themselves as others see them.

¶ 120    The law understands this. As a result, individual judges are *not* the sole and exclusive arbiters of whether their own continued participation in a case offends Rule 63. As I have discussed, this court and our appellate court have recognized the authority of judges to whom petitions for substitution have been referred to assess whether another judge's participation in a case offends Rule 63's standards. See *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163; *In re Moses W.*, 363 Ill. App. 3d 182. Whether a trial judge should have disqualified himself or herself from hearing a case based on the appearance of impropriety is also subject to scrutiny by courts of review following appeal of the circuit court's judgment (see *In re Marriage of Wheatley*, 297 Ill. App. 3d 854 (1998); *People v. Bradshaw*, 171 Ill. App. 3d 971, 976 (1988); see also *People v. Wilson*, 37 Ill. 2d 617, 621 (1967)) and may be considered by the Courts Commission in the context of disciplinary proceedings under article VI, section 15, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, § 5) (see Ill. S. Ct. Rules, Preamble, Code of Judicial Conduct (eff. Aug. 6, 1993)).

¶ 121    The General Assembly has determined that in certain situations addressed by Supreme Court Rule 63(C)(1), the appearance of impropriety is so manifest and easily identifiable that a substitution of judge may be awarded by the trial judge, on his own motion, without the application of either party or the need to refer the matter to another judge for consideration. 735 ILCS 5/2-1001(a)(1) (West 2006). These are situations in which the judge "is a party or interested in the action, or his or her testimony is material to either of the parties to the action, or he or she is related to or has been counsel for any party in regard to the matter in controversy" (735 ILCS 5/2-1001(a)(1) (West 2006)), circumstances addressed by Supreme Court Rules 63(C)(1)(b), (C)(1)(d), (C)(1)(e). See Ill. S. Ct. Rs. 63(C)(1)(b), (C)(1)(d), (C)(1)(e). Even in those instances, however, parties are not left to the whims or personal insights of the trial judge. If the judge does not raise the issue *sua sponte*, the statute gives the parties the right to apply for a substitution of judge. 735 ILCS 5/2-1001(a)(1) (West 2006).[12]

---

[12]I note, parenthetically, that the legislature's reference in section 2-1001(a)(1) to certain of the specific circumstances mentioned in Rule 63(C)(1) cannot reasonably be construed as evincing a legislative intent that no other circumstances addressed by Rule 63(C)(1) may serve as the basis for an application for substitution of judge. When section 2-1001 is construed as a whole and in the historical context described in this opinion, the proper inference is that what the legislature actually intended is that when a party wishes to obtain a substitution of judge based on any of the remaining circumstances covered by Rule 63(C)(1), he or she must proceed in the manner specified by section 2-1001(a)(3), rather than under section 2-1001(a)(1). Such a construction is, I would also point out, the only one which avoids fundamental principles of separation of powers. Determining which judges should be permitted to sit on which cases directly implicates core judicial power over administration of the courts. Such power is vested in the courts, not the legislature, and the legislature is constitutionally prohibited from enacting laws which unduly infringe on the authority of the judiciary. Ill. Const. 1970, art. II, § 1; art. VI, § 1; see *People v. Felella*, 131 Ill. 2d 525, 538

-29-

¶ 122    The notion that individual judges have sole and exclusive authority for determining whether they should continue to participate in a given case is untenable for another reason as well. It would enable judges to continue to sit on cases even where their participation in the case would deprive one of the litigants of a fair trial. Such a result is impermissible under the due process clause of the United States Constitution. See *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009) (reversing judgment of the Supreme Court of Appeals of West Virginia on federal due process grounds where one of the participating justices should have recused himself but refused to do so).

¶ 123    Not only should judges not be the sole and exclusive arbiters of whether they should continue to participate in a case, some have questioned whether they should *ever* be permitted to sit in judgment of requests for their own disqualification. As one recent scholarly work has pointed out:

> "The fact that judges in many jurisdictions decide on their own recusal challenges, with little to no prospect of immediate review, is one of the most heavily criticized features of United States disqualification law–and for good reason. Recusal motions are not like other procedural motions. They challenge the fundamental legitimacy of the adjudication. They also challenge the judge in a very personal manner; they speculate on her interests and biases; they may imply unattractive things about her. Allowing judges to decide on their own recusal motions is in tension not only with the guarantee of a neutral decision-maker, but also with our explicit commitment to objectivity in this arena. 'Since the question whether a judge's impartiality "might reasonably be questioned" is a "purely objective" standard, it would seem to follow logically that the judge whose impartiality is being challenged should not have the final word on the question whether his or her recusal is "necessary" or required.' [Citation.]" Deborah Goldberg, James Sample & David E. Pozen, *The Best Defense: Why Elected Courts Should Lead Recusal Reform*, 46 Washburn L.J. 503, 530 (2007).[13]

¶ 124    In response to the argument that permitting litigants to use Rule 63(C)(1)'s standards in petitions for substitution will encourage "judge shopping" or unleash a flood of substitution petitions, I would note that similar arguments were considered and expressly rejected by the United States Supreme Court in *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265.[14] I would

---

(1989).

[13]This passage speaks of both disqualification and recusal. For purposes of the article, the authors use the terms interchangeably and say so specifically. 46 Washburn L.J. at 504 n.5.

[14] Perhaps mindful of the United States Supreme Court's rejection of such arguments, the majority raises them only with respect to application of the objective standards established by our

further note that such concerns have not been borne out by experience. Empirical evidence thus far gathered in the wake of *Caperton* has dispelled concerns that courts would be overwhelmed with motions to invoke its objective due process standards. Jonathan H. Todt, Note, *Caperton v. A.T. Massey Coal Co.: The Objective Standard for Judicial Recusal*, 86 Notre Dame L. Rev. 439, 464-67 (2011). A similar conclusion may be drawn with respect to this court's precedent applying the objective standards set forth in Rule 63(C)(1) of the Code of Judicial Conduct. Our opinion in *Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, which applied those objective standards to a petition for substitution under section 2-1001(a)(3), was filed more than three years ago. *In re Moses W.*, 363 Ill. App. 3d 182, where the same thing was done in a criminal case, was filed even longer ago than that. The precedent is not new. If permitting Rule 63's standards to be considered in petitions for substitution was going to trigger an increase in improper efforts at judge shopping, the trend would presumably be in evidence by now. The majority has not cited and I have not seen any such evidence.[15]

¶ 125　　Nor is there evidence that other jurisdictions have encountered any such difficulty when applying the analogous provisions of their law. In Missouri, for example, the principle that an objective appearance of impropriety standard can be fairly and effectively applied at the trial court level in the context of a motion for substitution for cause decided by a second judge is so well established that the state's appellate court reviews cases involving the denial of such motions as if the principle were self-evident. See *State ex rel. McCulloch v. Drumm*, 984 S.W.2d 555, 557 (Mo. App. 1999).

¶ 126　　The experience of the federal courts offers additional reassurance. Federal district courts are subject to the provisions of 28 U.S.C. § 144, a mechanism for substitution of judge which bears some similarity to section 2-1001(a)(3) of our Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)). It provides:

　　　　"Whenever a party to any proceeding in a district court makes and files a timely

---

state's judicial canons and ignores them when discussing the objective standards required by due process. Both sets of standards, however, arise from similar concerns and both entail consideration of similar factors. If the majority concedes that there is no legitimate basis for concern over abuse when a petition for substitution is premised on constitutionally based objective factors, it is difficult to grasp why they regard potential abuse as such an impediment in the case of petitions premised on objective standards imposed by the Code of Judicial Conduct. If my colleagues have an explanation for this apparent inconsistency, they have not shared it.

[15]One explanation for why it has not been a problem may be that the third-party decisionmakers who conduct the inquiry are judges themselves, and so "have a professional and personal interest in ensuring that such [fishing] expeditions do not flourish." 46 Washburn L.J. at 531.

and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." 28 U.S.C § 144 (2006).

¶ 127    All federal judges, including federal district court judges, are also subject to a separate statutory provision, 28 U.S.C. § 455(a), whose substantive provisions are virtually identical to Rule 63(C)(1) of this state's Code of Judicial Conduct. It states:

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (2006).

¶ 128    While 28 U.S.C. § 455(a), which speaks of a judge disqualifying himself, is self-executing, and 28 U.S.C § 144, which requires action by a party, is not, the federal courts have held that the terms of section 455(a) also apply to motions for substitution under 28 U.S.C. § 144 (*Doe v. Cin-Lan, Inc.*, 2010 U.S. Dist. LEXIS 7845 (E.D. Mich. Feb. 1, 2010) ("[s]ection 455 substantially overlaps and subsumes section 144")) and that the two statutes are now subject to the same substantive standard, namely, " '[w]hether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' " *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) (quoting *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986)); *Easley v. University of Michigan Board of Regents*, 853 F.2d 1351, 1356 (6th Cir. 1988). Accordingly, litigants in federal courts are permitted to invoke standards equivalent to those set forth in Rule 63(C)(1) as grounds for having a case transferred to another judge. My research has disclosed nothing to suggest that this practice, which has been in place for decades, has had any adverse effects on the integrity of the judicial process or interfered in any way with the orderly administration of justice.

¶ 129    Finally, I note that if, at some point in the future, litigants do begin abusing petitions for substitution based on the standards set forth in Rule 63(C)(1) in order to "judge shop" or for some other improper purpose, trial courts have a potent remedy. They may impose sanctions pursuant to Supreme Court Rule 137 (Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)).

¶ 130    Having discussed the existing standards governing petitions for substitution under section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)), I next consider how, if at all, those standards were affected by the United States Supreme Court's recent decision in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. ___, 129 S. Ct. 2252 (2009). *Caperton* concerned a decision by the Supreme Court of Appeals of West Virginia to reverse a $50 million jury verdict against a coal company and its affiliates. Knowing that the case would ultimately reach the Supreme Court of Appeals, the coal company's chairman, chief executive officer and president, Don Blankenship, invested millions of dollars to help prevent the reelection of one of the court's members and to replace that justice with an attorney named Benjamin. Blankenship's campaign expenditures totaled $3 million, a sum

which exceeded the campaign expenditures made by all of Benjamin's other supporters combined and was three times the amount spent by Benjamin's own election committee. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2257. Blankenship's efforts were successful, and Benjamin defeated the incumbent justice, winning over 53% of the vote.

¶ 131    Following Benjamin's election, the successful plaintiff in the *Caperton* case moved to recuse Benjamin from participating in the appeal. Benjamin denied that motion. The Supreme Court of Appeals of West Virginia subsequently granted review of the *Caperton* case and reversed the $50 million judgment by a vote of 3 to 2. Benjamin joined the majority opinion, which was authored by another member of the court. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2258.

¶ 132    The plaintiff in the case sought rehearing, and the parties requested disqualification of three of the five justices who had participated in the appeal, including Justice Benjamin. Two of the three justices elected to recuse themselves, one based on his personal relationship with Blankenship, the other based on his public criticism of Blankenship's role in Benjamin's election. Benjamin, however, decided to continue participating in the appeal and ended up serving as acting chief justice of the court. In that capacity he selected two judges to replace the two justices who had recused themselves. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2258.

¶ 133    These events triggered another motion by Caperton to disqualify Benjamin. Benjamin denied that motion as well, and the case was reheard by the court on the merits. Rehearing resulted in a new opinion, which once again reversed the jury's verdict by a vote of 3 to 2, with Benjamin supporting the majority's view. Caperton petitioned the United States Supreme Court for review. The Court granted *certiorari*, and reversed and remanded for further proceedings. *Caperton*, 556 U.S. ___, 129 S. Ct. 2252.

¶ 134    In reaching that result, the Supreme Court noted that most matters relating to judicial disqualification do not implicate the federal constitution. It further observed, in the context of challenges arising in states where judges are elected, that not every campaign contribution by a litigant or attorney requires a judge's recusal. It held, however, that the relative size of Blankenship's expenditures in comparison to the total amount spent on the campaign; the total amount spent in the election; the significant and disproportionate effect of Blankenship's contributions on the election's outcome; and the temporal relationship between the campaign contributions, Justice Benjamin's election, and the pendency of the *Caperton* litigation made this an exceptional case. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2264. In the Supreme Court's view, these facts presented an extreme situation triggering federal due process concerns and requiring recusal of Justice Benjamin. "Although there [was] no allegation of a *quid pro quo* agreement," Justice Kennedy wrote for the majority, "the fact remains that Blankenship's extraordinary contributions were made at a time when he had a vested stake in the outcome. Just as no man is allowed to be a judge in his own cause, similar fears of bias can arise when–without the consent of the other parties–a man chooses the judge in his own cause. And applying this principle to the judicial election

-33-

process, there was here a serious, objective risk of actual bias that required Justice Benjamin's recusal." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265.

¶ 135    While the Court recognized that Justice Benjamin undertook "an extensive search for actual bias," and did not question his subjective findings of impartiality and impropriety, it held that this was but one step in the process; "objective standards may also require recusal whether or not actual bias exists or can be proved." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265. In this case, the Court opined, there was a "failure to consider objective standards requiring recusal," and that failure was "not consistent with the imperatives of due process." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265.

¶ 136    The Court took care to characterize the particular factual situation before it as "extraordinary" and "extreme by any measure." It further noted that the parties had been unable to point to any other instance "involving judicial campaign contributions that present[ed] a potential for bias comparable to the circumstances in [the] case." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265. The Court then went on to observe that nearly every state has now adopted canons of judicial ethics that incorporate an objective standard for assessing whether recusal of a judge is appropriate. Those standards, derived from the American Bar Association's Model Code of Judicial Conduct, are the same as those set forth in canons 2 and 3 of this state's Code of Judicial Conduct (Supreme Court Rules 62 and 63). See *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2266. The Court viewed the code provisions as providing more protection than due process requires. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2267. It therefore predicted that most disputes over disqualification of judges would be resolved without resort to the Constitution and that "[a]pplication of the constitutional standard implicated in [the] case will thus be confined to rare instances." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2267.

¶ 137    Because Illinois is among the states to have adopted the more rigorous objective standards discussed by the Court in *Caperton* and because those standards may serve as the basis for substitution of judge for cause under section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2006)) even where actual prejudice cannot be shown, *Caperton* does not alter existing law in Illinois. To the contrary, it is entirely consistent with the approach this court has already adopted.

¶ 138    In analyzing the interplay between *Caperton* and Illinois law governing substitution of judges, the majority correctly recognizes that section 2-1001(a)(3)'s provision for a hearing before a different judge does help address due process concerns identified by the United States Supreme Court. I am troubled, however, by the majority's implication that the availability of a neutral fact-finder under section 2-1001(a)(3) in some way offsets the need to insure that original trial judge is not only impartial in fact, but also impartial in appearance. See *supra* ¶ 46. If that is what my colleagues truly mean to say, they are mistaken. Indeed, such a view would run directly counter to the central teaching of *Caperton*.

¶ 139    As described earlier in this special concurrence, the problem in *Caperton* was not that

the judge whose participation in the case was challenged was actually biased. In fact, the United States Supreme Court specifically said that it did not question the judge's subjective finding of impartiality and propriety and was making no determination as to whether he was actually biased. *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2263. Nor was the problem that the judge himself was left to make his own assessment of whether he was actually biased (though that unquestionably made things worse). The overriding concern of the Court was, instead, that the extreme facts of the case, when viewed objectively, presented a risk of actual bias which the federal Constitution could not tolerate. *Caperton*, 556 U.S. at ___ , 129 S. Ct. at 2265. It was "[t]he failure to consider objective standards" requiring removal of the challenged judge that was, in the Court's view, "not consistent with the imperatives of due process." *Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265.

¶ 140    The need for objective standards did not originate with the *Caperton* case. It is deeply rooted in the due process jurisprudence of the United States Supreme Court. As one eminent constitutional scholar has observed,

> "The Supreme Court has traditionally placed enormous weight on securing the *neutrality* of due process hearings. In this area, indeed, the Court's approach to due process has tended to stress its *intrinsic* aspects as much as its *instrumental* aspects, focusing on the 'moral authority' of the law as well as the accuracy of its application. Thus, 'the right to an impartial decision-maker is required by due process' in every case. [Citation.] And since 'the appearance of evenhanded justice ... is at the core of due process,' [citations] the Court will disqualify even decision-makers who in fact 'have no actual bias' if they might reasonably *appear* to be biased. [Citations.]" (Emphases in original.) Laurence H. Tribe, American Constitutional Law § 10-16, at 555 (1978).

¶ 141    Because the need for consideration of objective standards was the lynchpin of *Caperton*'s due process analysis and because objective standards may require removal of a judge from a case "whether or not actual bias exists or can be proved" (*Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265), it is obvious that having a motion for substitution of judge decided by a judge other than the one whose participation is being challenged does not, in itself, eliminate the due process concerns expressed in that case. No matter who makes the decision on a trial judge's continued participation in a case, and no matter how fair and impartial that person may, in fact, be, objective standards must still be taken into account.

¶ 142    This case was certified to us because the appellate court believed that Illinois law governing substitution of judges was in a state of confusion and that guidance from our court would be helpful. The division in the appellate court panel which certified the case and the disagreement among the members of our own court regarding the state of the law confirm that guidance is needed and needed badly. It is for that reason that I resisted Justice Garman's suggestion that we defer, until another time, consideration of the interplay between section 2-1001(a)(3), Rule 63(C)(1) of the Code of Judicial Conduct, and the due process principles

set forth in *Caperton*. In retrospect, however, we may have been better off to follow her lead, for under the court's decision today, the law governing substitution of judges in Illinois has suffered a significant reversal.

¶ 143    The United States Supreme Court's decision in *Caperton* was predicated on the belief that application of standards such as those contained in Rule 63(C)(1) would insure that courts would rarely be confronted by situations in which disputes over disqualification would have to be resolved by resort to the federal Constitution. In ruling as it did here, however, the majority fundamentally altered this legal framework. In the case of petitions for substitution of judge under 2-1001(a)(3), my colleagues have eliminated 63(C)(1)'s standards from consideration. Objective concerns may still be taken into account, but instead of looking to Rule 63(C)(1), litigants seeking relief under 2-1001(a)(3) will now have to frame their arguments solely in terms of federal due process standards as articulated by *Caperton*. Correspondingly, Illinois judges to whom substitution petitions have been presented will be barred from applying the familiar and well-developed objective standards contained in Illinois' judicial canons. They will be limited instead to consideration of the newer and largely undeveloped objective standards imposed by the United States Constitution. This is exactly opposite of the result anticipated by the *Caperton* Court.

¶ 144    The majority has not cited and I have not found a single instance in which any other jurisdiction has held that when considering whether a state judge should be precluded from continuing to sit on a case based on objective standards governing a tribunal's perceived neutrality, federal law applies but state law does not. There is a reason why that is so. It is because the objective standards governing judicial conduct dictated by state law and objective standards mandated by federal due process are not separate and unrelated. To the contrary, they are both addressed to the same fundamental value, namely, that the adjudicative process must provide not only the reality but also the appearance of fairness.

¶ 145    The close relationship between the two standards has been recognized elsewhere. A good illustration is found in Rule 2.003(C)(1)(b) of the Michigan Court Rules of 1985, as amended in March of 2010, in the wake of the *Caperton* decision. It provides that the disqualification of a judge is warranted when the judge, "based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey* [citation], or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct." While the text of the rule itself uses "appearance of impropriety" language only in subsection (ii), in practice, both subsections are viewed as variants of that same core concept. See, *e.g.*, *People v. Aceval*, 781 N.W.2d 779, 781 (Mich. 2010) (the inquiry as to "whether there is an appearance of impropriety *** is generally twofold: first, whether defendant's due process rights, as enunciated in *Caperton*, would be impaired by [the judge's] participation in [the] case, and second, whether there was an appearance of impropriety as set forth in *** the Michigan Code of Judicial Conduct that would require [the judge's] recusal.").

¶ 146    Ultimately, the difference between the objective due process standards for evaluating whether a judge should be permitted to continue to sit on a case and the objective state standards discussed by *Caperton*, including standards identical to those contained in Rule 63(C)(1) of the Code of Judicial Conduct, is merely one of degree. They are different points on the same continuum. While the state standards are more rigorous than those imposed by federal due process, the nature of the evidence relevant to each standard is similar, as is the fundamental nature of the factors a judge must take into account in assessing whether the respective standards have been satisfied. It is therefore entirely appropriate for a judge to whom a petition for substitution has been referred to be allowed to consider state law standards, just as that judge is permitted to consider the standard imposed by federal due process.

¶ 147    In holding that an Illinois judge considering a petition to substitute must stop short of the standards imposed by our own state's judicial code, my colleagues overlook the practical consequences of their decision. Nothing in their analysis alters the fact that under existing law, a party may seek relief on appeal on the alternative ground that a trial judge should have recused himself or herself under Rule 63(C)(1). The day will therefore soon come when an appellate court reviewing a decision to deny a petition for substitution will find that the circumstances in a case were not such that they presented a serious, objective risk of bias for due process purposes, but nevertheless be compelled to conclude that they were such that the judge's impartiality might reasonably be questioned and that the judge's participation in the case therefore contravened Rule 63(C)(1). Ample case law, cited earlier in this special concurrence, leaves no doubt that our appellate court can reverse a circuit court's judgment on that basis and that it may do so even in cases which do not involve a petition for substitution under section 2-1001(a)(3). The end result will therefore be the same as it would have had the complaining party been permitted to invoke Rule 63(C)(1) at the outset in his section 2-1001(a)(3) petition, but there will be an important difference. Under the majority's approach, initial consideration of the objective state standard will have been made by the very judge whose participation in the case is being challenged and by that judge alone. Consideration of the issue by a neutral second party will have been deferred until appeal, when the opportunity for an adversarial hearing before an impartial arbiter had already passed. It is difficult for me to see why anyone would regard this as a preferable outcome.

¶ 148    The news for elected judges in Illinois and throughout the United States is not good. Fueled by the influx of money into judicial elections and the erosion of canons of ethics, public confidence in the ability of elected courts to serve as fair and unbiased arbiters of disputes is being undermined. Deborah Goldberg, James Sample & David E. Pozen, *The Best Defense: Why Elected Courts Should Lead Recusal Reform*, 46 Washburn L.J. 503, 503-04 (2007). Indeed, some have now gone so far as to assert that the very practice of electing judges has become incompatible with the state's interest in an impartial judiciary. See Jonathan H. Todt, Note, *Caperton v. A.T. Massey Coal Co.: The Objective Standard for*

*Judicial Recusal*, 86 Notre Dame L. Rev. 439, 440 n.12 (2011) (citing retired Supreme Court Justice Sandra Day O'Connor).

¶ 149　　Whether or not one agrees with that view, there can be no question that the legitimacy of an elected judiciary depends on whether and how well it can preserve both the reality and the appearance of justice. See Goldberg, Sample & Pozen, *supra*, at 503-04. Critical to that effort is that we be vigilant and unwavering in our enforcement of statutes, rules of court and judicial decisions designed to advance those goals. Regrettably, the majority has elected not to follow that course. When they should be leading the way forward, my colleagues have chosen, instead, to take a major step backwards. I cannot join them in this. Accordingly and for the reasons set forth above, I would hold that we should recognize, as we have already recognized, that the objective standards set forth in Rule 63(C)(1) may be invoked as the basis for a petition for substitution under section 2-1001(a)(3) and may be considered by the judge to whom that petition is referred.

¶ 150　　And so we come to the ultimate question in this case, whether the judge who ruled on John's petition in this case properly concluded that it should be denied. A circuit court's determination as to whether sufficient cause exists to order substitution under section 2-1001 of the Code of Civil Procedure (735 ILCS 5/2-1001 (West 2006)) will be upheld unless it is contrary to the manifest weight of the evidence. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Halpin v. Schultz*, 234 Ill. 2d 381, 391 (2009).

¶ 151　　The petition for substitution filed by John in this case appears to have been predicated on a claim of actual prejudice. The circuit court judge who ruled on the petition, however, not only considered and rejected the claim that Judge Waldeck was actually prejudiced, he also found no merit in the notion that removal of the judge was necessary in order to avoid the appearance of impropriety.

¶ 152　　Now that the matter is on appeal, John no longer claims that Judge Waldeck had any actual prejudice against him. He focuses, instead, on the proposition that Judge Waldeck should not have heard the case because the judge's interactions with Lisa created the appearance of impropriety.

¶ 153　　This contention was properly rejected by the appellate court just as it was properly rejected by the circuit court judge who ruled on John's petition. The testimony presented at the hearing on John's petition to substitute was set forth in detail earlier in this opinion. Based on that evidence, the circuit court concluded that the only contact between Judge Waldeck and Lisa consisted of the exchange of greetings in the fitness club parking lot. I have found nothing in the record that would bring this determination into question. It appears entirely accurate. For a judge to return a hello from a litigant encountered by chance, in public, as happened here, evinces courtesy, not favoritism. I fail to understand how such a display of simple good manners could ever be regarded as inappropriate. If the facts in

*Caperton* represent one extreme on the continuum of the "appearance of impropriety" scale, as the United States Supreme Court has held (*Caperton*, 556 U.S. at ___, 129 S. Ct. at 2265-66), Judge Waldeck's return of hellos to Lisa surely represents the opposite extreme.

¶ 154    I note, moreover, that prohibiting the type of conduct shown by the record in this case could present significant obstacles to the administration of justice. Judges are required by our state's constitution to be residents of the units which select them. Ill. Const. 1970, art. VI, § 11. It is therefore inevitable that they will, from time to time, encounter persons involved in cases pending before them as they go about their daily routines. That is especially true in circuits outside major metropolitan areas. If judges in such circuits were barred from presiding over a matter simply because they had said hello to someone involved in the case outside the courtroom, their ability to manage the circuit's legal business could be seriously impaired. Our court recognized this 40 years ago when rejecting a claim that a criminal defendant's due process rights were violated when the trial judge denied a motion to substitute based on communications between the judge and a potential witness who was apparently related to one of the defendant's victims. As we observed in that case, "[t]o say that any involuntary meeting or conversation, no matter how trivial, gives rise to cause for disqualification would present too easy a weapon with which to harass the administration of *** justice and to obtain a substitution of judges." *People v. Hicks*, 44 Ill. 2d 550, 557 (1970).

¶ 155    In an effort to find support for his position, John attempts to depict Judge Waldeck's conduct as more than an exchange of social pleasantries. In his view they are tantamount to the type of *ex parte* contacts prohibited by another subsection of Rule 63 of the Code of Judicial Conduct, subsection (A)(4) (Ill. S. Ct. R. 63(A)(4)). What John fails to recognize is that the *ex parte* contacts barred by Rule 63(A)(4) are those "concerning a pending or impending proceeding." Ill. S. Ct. R. 63(A)(4). No such contacts occurred here. As I have indicated, the circuit judge charged with responsibility for hearing the petition to substitute found that the only contact between Lisa and Judge Waldeck consisted of the simple exchange of greetings in the fitness club parking lot. That determination is amply supported by the record. One therefore cannot say that the circuit court's decision to deny John's petition to substitute was contrary to the manifest weight of the evidence.

¶ 156    This conclusion is supported by the appellate court's decision in *People v. Dunigan*, 96 Ill. App. 3d 799 (1981). In that case, the defendant argued that the trial judge should have been disqualified because, among other things, the defendant's victims had approached the judge and spoken to him during a chance encounter at a tavern after the verdict had been returned but prior to sentencing. In rejecting defendant's contention, the appellate court reasoned that there was no evidence that the case had been discussed and, absent such evidence, the isolated exchange between the victims and the judge, which the judge had not initiated, was not sufficient to make disqualification necessary. Id. at 812-13. Such is the case here as well.

¶ 157                          CONCLUSION

¶ 158      For the foregoing reasons, I believe that the appellate court correctly rejected John's challenge to judgment of the circuit court. The appellate court's judgment should therefore be affirmed.

¶ 159      CHIEF JUSTICE KILBRIDE joins in this special concurrence.